197 So.2d 437

Hubert Damon STRANGE

v.

STATE.

7 Div. 837.

Court of Appeals of Alabama.

Aug. 23, 1966.

Rehearing Denied Sept. 19, 1966.

John C. Walters, Troy, J. B. Stoner, Augusta, Ga., for appellant.

Richmond M. Flowers, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

CATES, Judge.

This appeal was submitted on oral argument May 26, 1966.

The grand jury of Calhoun County returned an indictment filed August 27, 1965, against Strange for the first degree murder of Willie Brewster.

Strange was arraigned on the indictment October 25, 1965, and his trial was had to a petit jury on December 2, 1965.

The jury found Strange guilty of murder in the second degree and fixed his punishment at the minimum for said offense, i. e., ten years imprisonment in the penitentiary. Code 1940, T. 14, § 318. The court, after adjudging him guilty and after allocutus, proceeded to sentence him in accordance with the verdict.

Thereafter, probation having been denied, Strange filed a motion for new trial which, in due course, was overruled.

I.

The tendency of the State's evidence was:

On the night of Thursday, July 15, 1965, about 10:30 P.M. the State's witness, Jimmy Glen Knight accompanied by his wife and the appellant left a rally in front of the Calhoun County Courthouse in Anniston. They went thence to the home of Bill Rozier.

About ten minutes later appellant left Rozier's house with two other men, Lewis

Blevins and Johnny DeFries. They came back at about 11:30 P.M.

The three drove up in a light colored 1955 Chevrolet from which the front bumper had been removed. DeFries was the driver.

Knight was in the yard with Rozier. The transcript at this point in the examination in chief of Knight is set out in Appendix A.

The gist of this evidence was that Rozier and Knight had been on the point of departure to buy beer when DeFries, Blevins and Strange drove up.

Rozier, Blevins and appellant went in Knight's car to DeFries's house, thence out State Highway 202 going West.

After the District Attorney laid predicates to show voluntary admissions against interest without inducement from any one present, Knight testified that:

*First*, Blevins stated that appellant put a "pumpkin ball" in a Negro; and

*Second*, appellant said, "I got one I am pretty sure because the car was swerving off the road. I had to lean out the window to get a shot off."

On this quest for beer, the four rode past a car with its rear window shattered. Knight saw a man "from the knee down lying in front of the car." This the State submitted was the deceased.

After Knight had testified before the grand jury, he encountered the appellant and his brother, Robert Strange, at Bill Sparks's Restaurant. Robert and appellant both beat on Knight's head.

The appellant handed his brother a gun which Robert pointed at Knight. At one point, according to his testimony, "They said they were going to kill me * * *."

To Knight's demand for a reason, the appellant told him, "You know why, Jimmy." The testimony continued:

"By then I had been knocked to the floor and Damon had the pistol, his .22 pistol, I assume it is his, the one he was carrying,

cocked and had pointed it toward me and I come up from the floor with my pistol and grabbed his pistol and his pistol went off and nicked me in the hand. And his brother, Robert, beat me to the ground along with Damon, I carried Damon down with me and when I got Damon to the floor I shot him and wrestled his pistol out of his hand and threw it in a corner and after that Robert wrestled my pistol out of my hand and held it on me and I asked what was going on here with you people, I said, 'You are crazy'. And I jumped the counter and out the backdoor I went.

"Q   You ran and left them there?

"A   Yes, sir."

The State also adduced proof of the deceased, Willie Brewster, being in the company of three other foundry workers who lived in an adjoining county and rode to and from work together.

This group, all Negroes, worked on the early night shift, and on the night in question were at a filling station on West Tenth Street in Anniston getting gasoline and transmission fluid. While there three white men drove up in a 1955 Chevrolet without the front bumper and of a light yellow color.

As the Negroes left the filling station, the 1955 Chevrolet left, too, going in the same direction.

One of the passengers in the first car testified that no other car came along during the remainder of the journey, and that the lights of the following car carried right along until at some point on State Highway 202 beyond or near John Hardy Hill shots were fired, one of which went into the back of the Negroes' car and hit Brewster in the back of his upper chest region, causing the car to go into a swerve due to loss of control.

Apparently two or three shots were fired from the vehicle which was following before it turned off to the right at Forsythe's store.

On Brewster's being hit, the others in the car finally stopped it, got out and summoned help. Within a short time, city police, sheriff's deputies and State troopers were on the scene as well as a civilian War Department employee who attempted to save Brewster's life with first aid.

Evidence does not show clearly how long Brewster lived, but there was competent opinion evidence that his death was caused by a rifled slug (a pumpkin ball) fired from a 12-gauge shotgun.

The defense at the trial adduced evidence going to show an alibi, to the effect that Strange, during the critical portion of the evening in question, was at all times in the kitchen of his brother-in-law, Rozier.

There was also evidence that the prosecution's main witness, Knight, bore a bad reputation for truth and veracity in his home community.

Cross-examination also brought out that Knight was first willing to talk when he became a prisoner in the county jail on two charges of burglary and grand larceny; also that he had applied for a $20,000 reward which a number of citizens of the city of Anniston had offered for the apprehension and conviction of the persons who killed Brewster.

## II.

■ The first proposition of law arises from the trial judge's refusing to order the State to turn over to defense counsel a statement of Knight reduced to writing given to an agent of the Federal Bureau of Investigation.

"Q And when you finally decided to reveal it to a law enforcement officer, which law enforcement officer or officers did you reveal that to?

"A To Mr. Harry Sims and Joe Landers.

"Q Who is Joe Landers?

"A He is an agent for the F. B. I.

"Q And where were you when you gave him that information?

"A In this jail, Calhoun County Jail.

"Q Did you go there and meet them or were you a prisoner in the jail at the time?

"A At the time I was being held as a prisoner.

"Q Was your statement to them reduced to writing?

"A Did I write a statement?

"Q Did you write one and sign it or did they write one and you signed it?

"A They wrote it, it was in their handwriting.

"Q Now, you were talking to Mr. Sims. and F. B. I. Agent Landers, now which one wrote the statement down?

"A They both took the statement.

"Q Each one of them took a statement?

"A Yes, sir.

"Q Did you sign both the statements?

"A Yes, sir.

"MR. STONER: Your Honor, at this time, in accordance with the due process clause of the Fourteenth Amendment and the Sixth Amendment, I move the Court to require the State to produce those statements for the benefit of defendant's counsel so that they can be used for possible impeachment purposes.

"THE COURT: All right, Mr. Watson, take the jury upstairs. Same instructions apply, Gentlemen, as to discussing the case and all. We will call you back in just a minute.

"(Whereupon the jury was taken from the courtroom and the following proceedings were had out of the presence and hearing of the jury.)

"THE COURT: All right, what says the State on this motion?

"MR. WILLIAMS: As I recall, if it please the Court, I do not recall that the State of Alabama has adopted any such rule, that any notes taken by the investigating officer must be made available. And now if it was a confession on the part of the defendant, then I would say yes, but I do not believe it would be required of the Alabama law at this time.

"THE COURT: You want to argue the point, Mr. Stoner?

"MR. STONER: Yes, Your Honor. If it please the Court, as Your Honor knows, I don't agree with the United States Supreme Court about all their rulings, but in accordance with their rulings, practically the whole Federal Bill of Rights now applies to the State, as well as to the Congress and Federal Government. In accordance with their more recent rulings more so than ever before a citizen is entitled to the same rights in a State trial court as he is in a Federal court in so far as the due process clause of the Fourteenth Amendment is concerned. * * * this defendant is entitled to see any statement that the witness against him has signed, for impeachment purposes, otherwise he is being deprived of due process as being guaranteed by the Fourteenth Amendment and he has a benefit of the Sixth Amendment as a result of the due process clause of the Sixth Amendment.

"THE COURT: Have you got any cases to cite?

"MR. STONER: I don't have offhand, I can almost think of the name of the case though in which it was, the U. S. Supreme Court first ruled on the Federal Issue and I think it is probably generally known that Congress followed that with a, I think it was the Jencks Case * * *

"THE COURT: All right, you want to reply to that, Mr. Williams?

"MR. WILLIAMS: I just want to see any Alabama cases that says any thing to that effect, I don't believe there is any case that says Alabama law follows that.

"THE COURT: Come up here a minute, both of you.

"(Whereupon a discussion was had off the record.)

"THE COURT: I am going to allow him to look at the statement under the theory of the Jencks Case and the theory he could use it for impeachment of a State witness. I am going to grant his motion and require the State to produce it if they have it in their possession.

"MR. WILLIAMS: I want it understood, if you are making a motion for us to produce both—

"MR. STONER: No, just the State's the one Mr. Sims took down.

"THE COURT: The one Mr. Sims has I am going to grant your motion to it and deny it to the other.

"MR. STONER: I am going to take an exception to the one, as to the Federal one.

"THE COURT: I grant your motion as to the statement given to Harry Sims and signed by Jimmy Knight. And now, you want to see the statement right now?

"MR. STONER: I would like to see it by the time I start cross examination again."

Cited in support of claiming this ruling as error are Smith v. Pennsylvania, 376 U. S. 354, 84 S.Ct. 763, 11 L.Ed.2d 753; Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed. 2d 1103.

No showing was made of seeking a subpoena duces tecum nor of a motion to produce under Code 1940, T. 7, § 487.[1] Hence, there was no error. Parsons v. State, 251 Ala. 467, 38 So.2d 209; Husch v. State, 211 Ala. 274, 100 So. 321.

Jencks, supra, concerned itself with administration in Federal criminal trials. Thus, Congress has later channeled this phase of discovery into a matter for the trial judge to excise portions of statements so as to protect the flow of information to government prosecutors. Kahn, The Jencks Right: Judicial and Legislative Modifications, The States and the Future, 50 Va.Law Rev. 535, 543.

*Brady,* supra, affirmed a remandment for retrial only on punishment. 226 Md. 422, 174 A.2d 167. The remarks of the Maryland court anent the prosecution's suppressing the confession of an accomplice were approved. However, strictly as pointed out by Mr. Justice White, it is but passing dictum, "wholly advisory." 373 U.S. at 92, 83 S.Ct. 1194.

Smith v. Pennsylvania, supra, is not in conflict with what our Supreme Court, per Foster, J., stated in 1948 in Parsons, supra. There the opinion states (251 Ala. at 477, 38 So.2d at 216):

"We think the appropriate and dignified approach was as conducted in this case, that is, to move the court to request the Attorney General of the United States to make provision for the production of the information. If he declines to do so on request, the trial court has done its duty so far under the Constitution to provide due process. Then if defendant wishes to pursue the matter further, the way is open as pointed out in the opinion of the United States Attorney General, quoted

supra, by undertaking to secure the deposition of the Attorney General, or to require him to release it as evidence.

"We think the court should have granted the timely motion to request the Attorney General of the United States to release the evidence, and upon declining to grant the motion, the trial should have been continued on further motion, to give an opportunity to secure the evidence by deposition or otherwise in pursuit of due diligence."

However, as in the *Jencks* case, how is the defendant to know before trial that the prosecution's main witness has given a prior statement to Federal agents?

■ Surprise is defined in the context of the rules of evidence as a situation at trial arising when the adversary on a reasonable consideration could not have reasonably anticipated some part of the evidence adduced by his opponent. This alone, however, is not enough to confer a new trial. The court must be shown the effective possibility of rebuttal or explanation had the matter been disclosed earlier.

Code 1940, T. 7, § 489, provides:

"When any deed, writing, or other document which it may be necessary to use as testimony in any cause may be in the possession of any person resident in this state who is not a party to the cause, the clerk or register of the court, or justice of the peace, in which the cause is pending, shall, upon application of the party or his attorney desirous of using such testimony, issue a subpoena duces tecum, directed to the person having such book or other document in his possession, requiring him to appear and bring with him into court the paper desired to be used as testimony. Service shall be by a sheriff,

---

1. "In the trial of actions at law the court may, on motion and due notice thereof, require the parties to produce books, documents, or writings in their possession, custody, control, or power which contain evidence pertinent to the issue, in cases and under circumstances where they might be compelled to produce the same by the ordinary rules of proceedings in equity cases.

constable, or some private person, and the official return of the sheriff or constable, or the affidavit of such private person shall be sufficient evidence that the same was duly served. But in all cases the judge may require the summary production of any book or document by subpoena duces tecum, where the witness is able to produce it, and where the ends of justice require such summary production."

This section is supplemented by Code 1940, T. 7, § 426, which reads:

"The court or judge thereof, may, upon affidavit of their necessity and materiality, upon motion, compel, by order, either party to produce, at or before the trial, any book, paper, or document in his possession or power; the order may be made upon the application of either party, upon reasonable notice to the adverse party or his attorney. If not produced, parol evidence may be given of its contents."

■ No doubt confrontation and cross-examination cohabit in the same constitutional mansion. Stone, C. J., said in Tate v. State, 86 Ala. 33, 5 So. 575:

"The Constitution (art. 1, § 7) secures to every one, on trial for a public offense, the right 'to be confronted by the witnesses against him.' This constitutional right would lose half its value if the kindred right of cross-examination were denied. That right is probably and generally the most effective instrumentality for eliciting the witness' 'means of obtaining correct and certain knowledge of the facts to which he bears testimony.' 1 Greenl. Ev., § 446. It is only by virtue of it, and of its presumed exercise, that testimony once given may be proved after the death of the witness, in a subsequent trial between the same parties, concerning the same subject-matter. Marler v. State, 67 Ala. 55; 3 Brick. Dig. p. 441, § 523 et seq. The Circuit Court erred in denying to the ac-

cused the right to cross-examine the witness Boggus on his re-examination. * * *"

Our difficulty comes from two divergent points. One is from the tenor of defense counsel's oral motion.

Was it explicitly for the statement given to Agent Landers? Subsidiary to this, should it have been made in writing? Code 1940, T. 7, § 214, provides:

"All motions, including motions of a new trial, which are made in writing in any circuit court or any court of like jurisdiction in any cause or proceeding at law, shall, upon an appeal become a part of the record; and the ruling of the court thereon shall also be made a part of the record, and it shall not be necessary for an exception to be reserved to any ruling of the court upon any such motion; and it shall constitute a part of the record proper on appeal."

See Wimbush v. State, 237 Ala. 153, 186 So. 145.

Question two is: How can a state court, in comity and constitutional harmony, attach the person of a Federal agent? See *Parsons,* supra; United States, ex rel. Touhy v. Ragen, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417.

We believe that on the record before us defense counsel at one point seems to have abandoned his demand for the FBI statement. Yet his final exception to the court's ruling against him was an anomaly.

He inspected the statement given Sims, the State Investigator. Hence, we presume that he considered substantial justice was accorded his client from his failure to renew his motion in proper form (see *Parsons*) with a concomitant motion for continuance pending protocol-dictated-communication with the Attorney General of the United States.

The *Parsons* rationale serves a legitimate state interest to minimize State-Federal

friction. Henry v. State of Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408.

The *Smith* case, after remandment to the Supreme Court of Pennsylvania with six judges sitting, has three opinions, that by Mr. Justice Musmanno, a concurring and dissenting opinion by Mr. Justice Roberts in which he was joined by Messrs. Justices Jones and Eagen, and a dissenting opinion by Mr. Justice Cohen. Commonwealth v. Smith, 417 Pa. 321, 208 A.2d 219. Hence, no opinion commanded a majority.

At all events, it is clear from the facts in the *Smith* case that a definite pretrial effort was made some five days beforehand to serve a subpoena duces tecum upon the special agent in charge of the Philadelphia office of the FBI.

■ When the defendant, in effect, asks for the State District Attorney to produce a document, he should at least establish that this State official has such document or a copy thereof in his possession before the trial court will be put in error.

### III.

The only other substantial contention in appellant's brief which we consider to deserve detailed mention arises out of the requisites of Code 1940, T. 15, § 307, which reads:

> "A conviction of felony cannot be had on the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."

■ The determination as to whether or not the State's evidence has made a witness out to be an accomplice is a question of law initially directed to the trial judge. Ladd v. State, 39 Ala.App. 172, 98 So.2d 56.

■ The basic definition of what is an accomplice within the meaning of the stat-ute is found in Doss v. State, 220 Ala. 30, 123 So. 231, 68 A.L.R. 712. To be an accomplice the witness must, on the evidence, have been capable of being indicted and convicted for the same offense for which the accused is then being tried.

■ It is abundantly evident that neither the State's case nor Strange's claim of alibi is compatible with Knight's being an accomplice of Strange in the alleged killing of Brewster.

### IV.

■ The details of the fight between the brothers Strange against Knight were admissible on the theory of showing a purpose to intimidate a witness, and thereby to suppress evidence. Whatley v. State, 209 Ala. 5, 96 So. 605; Woodard v. State, 253 Ala. 259, 44 So.2d 241; Sandlin v. State, 25 Ala.App. 311, 146 So.2d 82.

We have carefully examined the entire record in accordance with the requirements of Code 1940, T. 15, § 389, and consider that the judgment below is due to be

Affirmed.

### APPENDIX A

7 Div. 837—Hubert Damon Strange v. State, appeal from Calhoun Circuit Court

Record, pages 127–132:

"Q And did any of them get out of the car?

"A They all got out, I think.

"Q All right, now, what did you see either one of them do, or say, what did you see either one of them do at that time?

"A Well, Johnny got out, opened the door and they said we got us a nigger.

"Q All right?

"A And then all at the same time he opened the door and there was a shotgun—

"MR. STONER: Your Honor, we want to object to anything he saw, it is not a part of the res gestae, it is not a part of any alleged confession, it is hearsay and therefore inadmissible.

"MR. WILLIAMS: What he saw the defendants doing, Judge, at the time.

"THE COURT: Come up here just a moment, both of you.

"(Whereupon a discussion was had off the record.)

"MR. WILLIAMS: I withdraw the question, except to what did you see one do at that time?

"MR. STONER: Your Honor, we would like to object on the same grounds.

"THE COURT: All right, overruled.

"MR. STONER: Exception.

"THE COURT: Go ahead and answer the question.

"Q (BY MR. WILLIAMS) What did you see them do at that time?

"A Get out of the car.

"Q All right, what else did you see either one of them do at that time?

"A Well, I saw, Johnny DeFries pulled out a shot gun from the floor board, back floorboard.

"Q All right, what did he do with the gun?

"A He pulled the gun out and held it for awhile, and then gave it to Mr. Rozier.

"Q All right, now, let me ask you this, at that time when you—in other words you said these fellows drove up there and you said what they did, did anybody there in your presence or in the presence of either one of them or all of them threaten them or offer them any inducement to get them to say anything?

"A No, sir.

"Q All right, now then, did any of them say anything, if so, which one said it?

"A Well, Johnny DeFries, when they first rolled up, said that they got a nigger, said, 'We got a nigger'.

"Q All right, now, was anything else said there at that time?

"A They were asked whereabouts, and they said—

"MR. STONER: Your Honor, we object to them saying, 'whereabouts', without saying who said it.

"THE COURT: All right.

"THE WITNESS: Bill Rozier said, 'Where,' and they said, 'John Hardy Hill'.

"Q All right, now then, was anything else said there by them that you remember?

"A One, let's see, Johnny DeFries said, 'Get the shells', the empty shell casings. And they proceeded to scramble in the floorboard to find the casings.

"Q Did you ever see whether they got any casings?

"A Yes, sir, they got two.

"Q All right, now then, where—did anybody go back in the house there at that time?

"A Well, Bill Rozier carried the gun into the house.

"Q All right, then tell us what happened?

"A Well, we decided, or it was decided to go check on what had been done.

"Q All right, did you go, did you leave that place there?

"A Yes, sir.

"Q Now who left there together?

"A Johnny DeFries left in his car and Damon [appellant] and Lewis and Bill Rozier and myself left in my car.

"Q And now, can you tell me when that car drove up there, was there anything particular about it that you noticed?

"A Well, it was running hot and just, it looked ragged, you know.

"Q It was hot?

"A Yes, sir.

"Q Now, did Johnny drive that car off?

"A Yes, sir.

"Q Did you see him anymore that night?

"A Yes, sir.

"Q When is the next time you saw him?

"A We followed him to his house and saw him there at his house.

"Q Did you stop there?

"A Yes, sir.

"Q Did he go with you then?

"A No, sir, he continued on.

"Q. Did he say what he was going to do?

"A Said he was going to bed, he had to work or had something to do.

"MR. STONER: Your Honor, we wish to object to that and move that it be excluded because it doesn't have anything to do with the nature of any confession.

"THE COURT: All right, overruled.

"MR STONER: Exception.

"Q And now, from where Johnny De-Fries was, who left from there?

"A Bill Rozier, myself, Lewis Blevins and Damon Strange.

"Q Who was driving?

"A I was driving.

"Q And where did you go?

"A Well, we rode around the block and more or less in front of Johnny's house and got on 202 and headed west.

"Q And there was just the four of you in the car?

"A Yes, sir.

"Q Now, when you—well, tell us as you proceeded on west, if there was any conversation, just yes or no and then I will ask you something else?

"A Yes, sir.

"Q Now, as you proceeded west, you say there was some conversation?

"A Yes, sir.

"Q I will ask you if you or anybody in your presence or in the presence of Damon Strange or Lewis Blevins, threaten them, offer them any inducement in order to get them to make a statement?

"A No, sir.

"Q All right, now, as you were going down the highway, 202, tell us what you first noticed, if anything?

"A We noticed a police car at a little store there, a little grocery store, and he had his red light on.

"Q Is that what is known as John Hardy Hill there?

"A Yes, sir. I think it is.

"Q Did y'all go on from there?

"A Yes, sir.

"Q All right, now, was anything said as you were proceeding?

"A Well, yes, sir.

"Q All right, what was it?

"A Blevins asked, or told us—

"MR. STONER: Your Honor, we object to it, Mr. Blevins isn't on trial today.

"MR. WILLIAMS: He is the defendant.

"THE COURT: All right, I will overrule.

"MR. STONER: Exception.

"MR. WILLIAMS: Go ahead.

"A Well,—

"Q What did he say?

"A Well, he said Damon put a pumpkin ball in him, something to that—

"Q I didn't understand you, put a pumpkin ball what?

"A In the nigger's—

"Q All right?

"A And we asked, I asked how many did he get and he said—

"Q And now, who answered to that?

"A I asked Damon how many did he get.

"Q All right, what did Damon say?

"A He said, 'I got one I am pretty sure because the car was swerving off the road'. He said, 'I had to lean out the window to get a shot off'. To get the shot off, to get a shot off, something like that.

"Q Where did you go then as you were driving along?

"A Well, we continued on and went to Starr's Drive-In.

"Q Well, did you pass by the—did you see this car?

"A Yes, sir.

"Q Did you stop there?

"A No, sir, they said, everybody said not to stop.

"Q Well, did you—what did you see as you drove by?

"A Saw the back glass, it appeared to be shattered, broken, and saw a man from the knee down lying in front of the car.

"Q Is that the same car that you had left here at the courthouse in, were you in the same car?

"A My automobile?

"Q Were you in the same car that you had left the courthouse in?

"A Yes, sir.

"Q And from there you went to where?

"A From the scene of the car, the murder car?

"Q Yeah.

"A Well, we rode to Starr's Drive-In and turned left to get to Highway 78.

"Q All right, where did you go there?

"Q Went to Sparks Sandwich Shop or Cafe, I don't know how it is titled, there at the intersection.

"Q All right, what did you do there?

"A Went in and ordered some beer."

