192 So.2d 461

**Harold Raymond LEONARD, Jr.,**

v.

**STATE.**

**6 Div. 169.**

Court of Appeals of Alabama.

Nov. 22, 1966.

---

Chas. R. Crowder, Birmingham, for appellant.

**456**

Richmond M. Flowers, Atty. Gen., and Robt. F. Miller, Asst. Atty. Gen., for the State.

CATES, Judge.

This appeal was submitted on written argument June 23, 1966.

Leonard seeks review of his conviction of voluntary manslaughter. The jury which found him guilty gave him the maximum punishment, ten years in the penitentiary.

## I.

### Motion to Strike

The State has moved to strike the transcripts of (1) the evidence and (2) the record in toto. Dismissal as a necessary consequence of these two expungements is asked by the Attorney General.

Judgment came on December 17, 1965. Appeal was noted below the same day.

Leonard, on January 20, 1966, filed with the circuit clerk a pauper's notice of appeal under Act 525, September 16, 1963 (Michie's 1958 Code, T. 15, §§ 380(14)–380(25)). This petition led to an order February 3, 1966, that the court reporter furnish Leonard a free transcript of the evidence to be filed in quadruplicate with the circuit clerk.

On March 25, 1966, Judge Gibson, for good cause shown, extended the time for the court reporter to file the transcript of evidence to April 20, 1966. Johnson v. State, 269 Ala. 1, 111 So.2d 610. It was filed on this latter day with the circuit clerk. The entire record was filed here May 6, 1966, which is sixteen days past April 20, the date of the record's establishment below. Michie's 1958 Code, T. 7, § 827 (1a), third sentence; Baxter v. State, 41 Ala.App. 533, 143 So.2d 191.

We consider that the Attorney General's motion to strike is not well taken. Under Keeton v. State, 278 Ala. 81, 175 So.2d 774, Act 525, supra, modifies the statutes making up Michie's 1958 Code, T. 7, §§ 827(1)–827(6), so that time cannot begin to run until the trial court has acted on the pauper's petition, if this is timely filed, i. e., within six months of sentence.

Here, February 3 was the date for starting calculation under Supreme Court Rule

**37.** April 20 thus marked the beginning of the sixty days granted in that Rule:

"* * * Where bills of exceptions have been abolished, the transcript of the record shall be filed in this court within sixty days after the transcript of the evidence has been established in the court below. * * *"

▓ Moreover, it is ironical if not paradoxical that the Attorney General should have suggested to our lawmakers the text of Act 525, supra, so as to furnish due process, yet now moves to strike a pauper's record when already prepared at public expense. Under the spirit of Code 1940, T. 15, § 389, this court will not honor requests to strike where a lower court, under *Keeton*, supra, has ordered a free transcript. See Rule 48.[1]

### II.

Christmas Eve 1964 the appellant, Leonard, was a passenger in the car of one Weldon as were Richard Hite and Larry Taylor. About seven o'clock Weldon drove to the vicinity of 1620 Eleventh Avenue South in Birmingham.

The three passengers, Leonard, Hite and Taylor, got out of the car. Going along a graveled alley, this trio came to a window of an apartment. All three looked in, and all remarked on the absence of Mr. James W. Rule who seemed to be known to them as the tenant.

They went to the rear, found an open window and took out the screen. Taylor crawled in, went to the front door and admitted Hite and appellant, Leonard.

Each took various belongings, e. g., two and one-half cases of whiskey, clothes, a suitcase, a television receiver and a billy stick. They removed the loot in stages: from the apartment to an adjacent field then to Weldon's car.

With Weldon driving the four went to the Miami Club on U.S. Highway 280. There, according to Hite, after Leonard had talked to one Ben Green, all four including Weldon carried the stolen goods into the Club.

Green gave Leonard some $75.00 which was divided among the four when they returned to the car.

Back in the city Leonard and Hite got out and went to a restaurant. Around 9:30 or 10:00 they met Taylor and Weldon again.

Weldon again drove to the same place where he had parked when Hite, Taylor and Leonard broke and entered Rule's apartment.

Again Weldon stayed in the car while Hite, Taylor and appellant, Leonard, went by a different route to Mr. Rule's back window. Rule had a visitor.

Leonard (appellant) eavesdropped at a door while Taylor and Hite stood "about six feet back up from the window, talking." In five or ten minutes Leonard returned to the other two. He related overhearing Rule complain to his visitor that some cash in the kitchen was missing. The three held a council of war:

"Q What did this defendant say about staying, or leaving?

"A He said he wanted to stay at the apartment until Mr. Rule left or they both left.

"Q What did Larry Taylor say?

---

1. "In cases at law where the court reporter's transcript of the evidence is not filed with the clerk of the circuit court within the time prescribed by law, but is filed within the time for taking an appeal, it will be considered by this court if no objection thereto is presented upon the submission of the cause; and it may be so considered in the discretion of the court, even though the point as to the delay be presented on appeal, unless counsel objecting thereto shall point out, with supporting affidavit, material omissions or defects in such certified transcript which should or would have been the subject of contest before the trial judge; in which latter event the certified transcript is not to be considered."—Rule 48.

"A He said he wanted to leave.

"Q What did you say?

"A I said I wanted to leave.

"Q Did the three of you leave, or return?

"A We decided we would stay, one would stay at the apartment while the other two left.

"Q Did two of you leave?

"A Yes, sir.

"Q Who?

"A Harold Leonard and myself.

"Q Where did you go, if you went any place?

"A We were hunting some cokes to mix some drinks with.

"Q Where did you go?

"A We drove around.

"Q How did you leave the apartment? When you left the apartment there, left Larry Taylor, which direction did you go?

"A We came back up across the field, the same route we had came down.

"Q Up on 17th Street?

"A Yes, sir.

"Q Did you get in the car up there?

"A Yes, sir.

"Q Was that the same car you had been in?

"A Yes, sir.

"Q Where was Wayne Weldon?

"A He was in the car.

"Q Did this defendant and you get in the car?

"A Yes, sir.

"Q Where did you go together?

"A We went to what is called Gables Square, on the Southside, hunting some cokes, and we got some cokes and took —Wayne Weldon had a girl with him. We took this girl home and returned to the opposite side of the apartments and parked on 16th Street.

"Q This time, you returned down this street (indicating)?

"A Yes, sir.

"Q Did you park close to the alley, or the other street, or close to 11th Avenue?

"A Right across the alley, going to 11th Avenue, South.

"Q You parked right here (indicating)?

"A Yes, sir.

"Q You said the girl had already been taken home when you parked there?

"A Yes, sir.

"Q How long did you and this defendant remain in the automobile while you were parked there?

"A Four or five minutes.

"Q Did you have some drinks then?

"A Yes, sir.

   *    *    *    *    *    *

"Q When you stayed there the length of time you stayed there, did the defendant get out of the car?

"A Yes, sir.

"Q Did you get out of the car?

"A Yes, sir.

"Q And did the two of you go together to some place?

"A Yes, sir.

"Q Where did the two of you go together?

"A We walked up the alley to Mr. Rule's apartment.

"Q On this occasion, you were the long street away from his apartment, is that right?

"A Yes, sir.

"Q And you walked up the alley?

"A Yes, sir.

"Q And where did you go when you got up there to where Mr. Rule's apartment was?

"A We went to the back, looking for Larry Taylor."—Hite's testimony in chief.

Rounding up Taylor, Leonard and Hite waited outside Rule's building for the visitor to go. It was agreed that the tactics would be for Leonard to knock and "take Mr. Rule inside and Larry Taylor was to follow." Hite was to stand outside and watch.

This scheme failed when Rule stood his ground and closed the door. Leonard's next plan was, as Hite told it:

"He said he would cut a hole in the screen and undo the latch. He said he would take Mr. Rule inside and Larry Taylor was to follow him.

"I was to go back to the back window to make sure—so that I could see if Mr. Rule had a gun, or not, when he came to the front door."

Whether Leonard got in by opening the screen or by another means is not quite clear. At all events, some ruse drew Rule to the door where Leonard and Taylor irrupted, the latter felling Rule with the billy stick.

Hite saw Taylor hit Rule between nine and thirteen times on his head with the truncheon. Rule was flat on his back with appellant, Leonard, part of the time standing over him holding him "on his shoulder, or right below his arms."

After Rule went inert, Leonard searched his trousers pockets taking out a billfold. At this point, Hite ran to the car. Taylor and appellant Leonard followed.

In the car the contents of Rule's wallet, close to $100, were divided four ways, among Leonard, Taylor, Hite and Weldon. Weldon drove to Five Points where he let Leonard and Hite out.

Rule died from this beating about a week later.

On cross, Hite admitted that he got a fourth of the money and was "the watchman." (R. 90.)

Part of Hite's examination on redirect ran:

"Q And was this defendant there in the jail at that time?

"A Yes, sir.

"Q Now, Richard, did you have any conversation with him concerning your testimony?

"A Yes, sir.

"Q Tell these gentlemen of the jury what he said to you and what you said back to him.

"A He said he would pick up a thousand dollar bond and give me a thousand dollars if I would say that I was drunk or too drunk that night to know what happened and I didn't know exactly what happened, or if I would leave the State of Alabama and not appear.

"Q Was anybody present except you and him when this was said to you?

"A Yes, sir.

"Q Who was it?

"A I don't know their names. They were in the other cell."

The record shows that Judge Gibson, shortly after Rule's death, had ordered that Hite give bond to appear as a material witness.

The other prosecution witnesses were:

1) Linda Dickerson, Rule's niece who saw him in University Hospital;

2) B. L. Landers, a neuro-surgeon who testified to the treatment rendered Rule and that a brain contusion which caused his death was consistent in etiology with Rule's "having received nine to thirteen blows with a heavy wooden object, similar to a billy stick, on or about the head";

3) R. B. McPherson, a telephone installation and repair man, who in answering a service call found Rule alive and bloody but mute;

4) C. L. Pierce, a homicide detective of the Birmingham police, who responded to McPherson's call; his testimony resembled McPherson's as to Rule's condition; and

5) Wayne Weldon, who undisputedly drove the car on the occasions of Leonard and the others going to Rule's apartment. This witness, Weldon, testified in part (R. 107) that

1) He met up with the other three, Hite, Taylor and Leonard about 6:00 P.M. Christmas Eve;

2) His 1957 Ford was the mode of transportation for the four;

3) He had known Rule before, at least by sight;

4) He parked the car with the front end right in the alley on 17th Street near 11th Avenue.

5) Beforehand in Weldon's car, one (or more) of the four stated that they should go to Jimmy Rule's apartment;

6) Weldon saw Leonard, Taylor and Hite get out and go toward Rule's apartment;

7) In twenty or twenty-five minutes he saw them return with "a suitcase, television, and about a case and four pints of whiskey as well as the night stick";

8) He drove when they took the spoils to the Miami Club;

9) He saw the buyer pay for the stolen goods, but he got none of the price;

10) He drove again to Rule's apartment where the three got out and "came almost straight back to the car";

11) On this occasion, again, one of the three, when all four were together, had asked Weldon to drive to Rule's;

12) He dropped Leonard and Hite, went by his girl friend's house then he, the girl (whom he later married) and Taylor went back to the place where he left Leonard and Hite;

13) All five went back to Rule's;

14) Taylor, Leonard and Hite again got out of the car going in the same direction down the alley as before;

15) Leonard and Hite came back in about twenty minutes;

16) They took the girl home then went back to the neighborhood of Rule's apartment.

17) In a few minutes Taylor walked up, there was some conversation, then the same three, Taylor, Leonard and Hite, got out and "went back down the alley, toward 16th Street";

18) In about thirty minutes all three came back and got in the car;

19) Weldon backed up the car, "went down the alley and parked on 16th Street";

20) Somebody said they were going back up to Rule's apartment and the three got out, went up the alley in the direction of 17th Street;

21) Around midnight all three came running back to Weldon's car;

22) "Somebody said something about going somewhere, and then one of them said something about the old man and something or other."

"A I believe somebody said something about hitting him, or something.

"Q Something about hitting him?

"A  Yes, sir.

"Q  Do you know which one said that?

"A  No, sir."

23) Weldon then took Leonard and Hite. downtown to the Hillman Hotel; and

24) About 3:30 Christmas morning Weldon drove Taylor to the Greyhound bus station.

On cross Weldon denied getting any part of the $75 or the $100. Once on the way back from the Miami Club, Taylor paid him for gasoline. Also Weldon admitted seeing Taylor holding the billy club. On direct he recalled Taylor's bringing it out on the first trip. He did not enumerate it in the things sold.

Weldon admitted to having worked for a store delivering goods and that this job entailed his going to Rule's apartment.

Summarizing, we find Weldon undisputedly on station on each of five occasions when the other three went toward Rule's abode.

a) Weldon had previously been to Rule's apartment;

b) Each time, among all four, there was some conversation beforehand about going there;

c) After the first trip the haul was sold for a relatively cheap price under cover of dark to one not shown to be an established trader;

d) Taylor bought Weldon gas and Weldon took him to the bus station;

e) Weldon had seen Taylor with the billy club and did not mention it as having been sold to Green;

f) Weldon drove all to and from Rule's on four occasions; and

g) On one occasion it was reasonably inferable that Taylor was being left behind to spy on the apartment.

After the State rested its case the defense did likewise without offering any evidence.

### III.

Since no other evidence in the trial than that of Hite and Weldon tends to connect Leonard with the killing of Rule, we must examine Weldon's testimony as to whether or not Weldon was an accomplice.

Code 1940, T. 15, § 307, reads:

"§ 307. A conviction of felony cannot be had on the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."

Under this statute, using one accomplice to corroborate another accomplice gives a quantitative sum of zero plus zero. Morris v. State, 17 Ala.App. 126, 82 So. 574; Evans v. State, 42 Ala.App. 587, 172 So.2d 796; People v. White, 62 Hun. 114, 16 N.Y.S. 571.

■ In the gestative stage those who act jointly in and about the commission of a crime are denoted as conspirators. Even though the plot succeeds, it is common to continue to call the parties conspirators.

Our penal code makes all concerned in a felony equally punishable whether principals or accessories, this though the helper may not be present. Code 1940, T. 14, § 14.

In Stokley v. State, 254 Ala. 534, 49 So.2d 284, after referring to the principle of confederative responsibility (hn. 8), Mr. Justice Lawson went on:

"When two or more persons enter upon an unlawful purpose, with a common intent to aid and encourage each other in anything within their common design, they are each responsible, civilly and

**462**

criminally, for everything which may consequently and subsequently result from such unlawful purpose, whether specifically contemplated or not. Jones v. State [174 Ala. 53, 57 So. 31]; Jolly v. State [94 Ala. 19, 10 So. 606]; Tanner v. State, 92 Ala. 1, 9 So. 613."

"The more flagrant and vicious the act agreed to be done, the wider is the latitude of the agency impliedly conferred to execute it."—Williams v. State, 81 Ala. 1, 1 So. 179.

From this last case we excerpt further as the court viewed the facts there under the rule of joint responsibility:

" * * * if five or six men combine together to invade a man's household, and they go there armed with deadly weapons for the purpose of attacking and beating him, and in furtherance of this common design, all of the confederates being present, or near at hand, one of them gets into a difficulty with their common adversary and kills him, all may not be guilty of murder, although they did not all entertain a purpose to kill. The question, we think must be answered in the affirmative, in the light of both principle and authority. * * * When a mob, conspiring together unlawfully, go to a man's house to do any serious violence to his person, especially in the night time as here, they can expect nothing else than to meet with armed opposition, and the inference is not unreasonable that they intend nothing less than to oppose force to force, in the furtherance of their design. The natural and probable consequence of this is homicide,—either of one or more of the assailants or of the party thus assailed, and such homicide, when committed by any one of the conspirators, can be nothing less than murder in all who combine to commit the unlawful act of violence, especially if they be near at hand

inciting, procuring, or encouraging the furtherance of the act of assault and battery."

See also Tanner v. State, 92 Ala. 1, 9 So. 613.

Our first enquiry, § 307 relating only to felonies, is as to the degree of offense charged.

■ Ordinarily a murder indictment includes also as an implicit lesser offense both degrees of manslaughter. Second degree manslaughter is a misdemeanor. Code 1940, T. 1, § 7;[2] T. 15, § 325, as amended.

Here, however, the trial judge refused a requested written charge (No. 18) which would have instructed the jury in accord with the form given in Jones, Alabama Jury Instructions, § 6771, which is taken from Jones v. State, 21 Ala.App. 234, 109 So. 189.

■ Thus the case went to the jury with homicide below the felony grade excluded from the jury's consideration. Therefore, under § 307 corroboration of Hite's testimony was needful.

There are three usual ways to pose the legal question of lack of corroboration to the trial judge: (1) by a written or oral motion to exclude the State's evidence; (2) by request, in writing, for the affirmative charge; and (3) by a ground for a written timely filed and presented motion for new trial.

Here defense counsel requested the affirmative charge in writing. See Brown v. State, 31 Ala.App. 529, 19 So.2d 88.

■ Secondly, how do we categorize one as an accomplice? Merely being at or near the scene of a crime even without raising the hue and cry does not make a man either principal or accessory to that crime. Pugh v. State, 42 Ala.App.

2. "§ 7. A felony within the meaning of this Code, is a public offense which may be punished by death, or by imprisonment in the penitentiary; all other public offenses are called misdemeanors."

499, 169 So.2d 27; Hollinger v. State, 40 Ala.App. 281, 112 So.2d 220; Davis v. State, 257 Ala. 447, 59 So.2d 592.

Foster's Report, Discourse III, of Accomplices in High Treason and other Capital Offences, Chap. I, Sect. 5, p. 350, was cited with approval in Martin v. State, 136 Ala. 32, 34 So. 205. The author there states:

Sect. 5. In order to render a person an accomplice and a principal in felony, he must be aiding and abetting at the fact, or ready to afford assistance, if necessary. And therefore if A. happeneth to be present at a murder for instance, and taketh no part in it, nor endeavoureth to prevent it, nor apprehendeth the murderer, nor levyeth hue and cry after him, this strange behaviour of his, though highly criminal, will not of itself render him either principal or accessary."

■ The classic test of determining whether the witness is an accomplice is: Could he have been indicted and convicted of the offense charged, either as principal or accessory. Doss v. State, 220 Ala. 30, 123 So. 231, 68 A.L.R. 712.[3]

■ Being indicted along with another does not alone mark one as an accomplice under the statute here of concern. Latham v. State, 38 Ala.App. 92, 77 So.2d 499.

The question of law for the court resolves itself into one of undisputed evidence. If this, taken altogether most favorably toward the noncomplicity of the witness, still leaves unchallenged acts which would support a verdict of guilt of the witness, then the court, if requested, must require the State to adduce corroboration. For a discussion of the process, see Read v. State, 195 Ala. 671, 71 So. 96.

Referring to McElroy, Evidence (2d Ed.), § 300.01(6), and Anno. 53 A.L.R.2d 817, we stated in Cooper v. State, ante, p. 385, 191 So.2d 224 (Ms. August 16, 1966):

"Summarizing, while there is some surface confusion as to the rationale of Dye v. State, 25 Ala.App. 138, 142 So. 111, contrasted with that of Jones v. State, 23 Ala.App. 395, 126 So. 178, and Motes v. State, 20 Ala.App. 195, 101 So. 286, yet we believe reference to the rule of Doss, supra, as to the definition of an accomplice harmonizes the rulings.

"We quote from Doss, supra, per Brown, J.:

" 'The test of whether a witness is an accomplice, within the meaning of section * * * is determined by the fact as to whether or not he could have been indicted and convicted of the offense charged, either as principal or accessory, and this depending upon the circumstances of the particular case may be a question of law for the court, or of fact for the jury. * * *'—Citing cases.

"In Dye, supra, whether the receiver was privy to the burglary, lay only in inference. Therefore, the receiver's complicity was a question of fact, not law.

"Jones (a conviction of larceny) was like the present case in that a receiver testifying against his connecting thief must be corroborated.

"In Motes, supra, Mrs. Blankinship was present when the conspiracy was launched. Also, she helped divide (and claimed part of) the spoils. Motes was convicted under a general verdict on a three-count burglary, larceny and receiving indictment. Hence, Mrs. Blankinship participated in probably all three phases of the same criminal transaction.

"Ladd v. State, 39 Ala.App. 172, 98 So. 2d 56:

---

3. The reference in Doss (hn. 9) as to questions of law relates to persons not

capable of doing the same act, e. g., briber and bribe taker.

"'The prosecution's evidence has made Mitchell, as a matter of law (i. e., for the purposes of requiring corroboration under § 307, supra), an accomplice. He admittedly was driving the truck at the outset of the whiskey running expedition, and, under familiar principles, being a participant in an illegal venture for one purpose, he becomes one for all, i. e., we look at him as a derivative accomplice so far as requiring corroborative evidence before we can say there is a prima facie case.'"

In Ferrell v. State, 41 Ala.App. 659, 148 So.2d 656, the two State witnesses, Smith and Lane, denied entirely voluntarily aiding Ferrell. There was no other testimony to corroborate Smith and Lane.

However, the whole predicate of Smith and Lane's being on the expedition was that Ferrell and Kirby kidnapped them and by threats pressed them into service. The opinion concluded:

"If Smith and Lane are not in complicity with Ferrell and Kirby, there is no field of operation for Code 1940, T. 15, § 307. It would be otherwise if Smith and Lane's own testimony admitted their guilt."

See also Hurley v. State, 42 Ala.App. 92, 153 So.2d 254.

McElroy, supra, § 300.01 (16), states:

"If the evidence of the defendant's guilt in a felony case consists solely of the testimony of a witness whom the undisputed evidence shows to be an accomplice, the judge cannot submit the felony charge to the jury. Lindsey v. State, 170 Ala 80, 54 So 516; Anno: 19 ALR2d 1352, 1362.

\* \* \* \* \* \*

"whether there is any non-accomplice evidence of the defendant's guilt is for the decision of the trial judge, not the jury. Williams v. State, 4 AlaApp 92, 58 So 925, syl 6;"

The rule of § 307, supra, is an exception to the general rules of admissibility of evidence and competency of witnesses. Hence it has been given a "liberal" construction in favor of the prosecution. Malachi v. State, 89 Ala. 134, 8 So. 104.

■ Therefore, in formulating from the decided cases and the jurisprudential writings concerning the role of the trial judge under this statute, we begin with the observation that usually complicity is a question of fact. The jury becomes ordinarily the judge of whether or not (1) a witness is an accomplice and (2), if he is, his testimony has been corroborated properly in character and weight.

Yet, at the threshold, there is a small area of a pure question of law. Were the judge to let all questions of § 307, supra, be adjudged by the jury, then, as the Oregon court points out, the jury would have the sole power to suspend or enforce the operation of a legislative enactment. State v. Carr, 28 Or. 389, 42 P. 215.

Accordingly, we consider this narrow field can be described basically in terms of the undisputed evidence, both in chief and on cross, both for prosecution and defense.

■ Thus a question of law is presented where, after allowing all reasonable presumptions in favor of not needing corroborative evidence, nevertheless the trial judge should be clearly convinced by a preponderance of the witness's testimony and all the other evidence (1) that the witness could have been indicted and convicted of the same charge of felony for which the defendant is on trial, and (2) that the witness has committed acts which admit of no other reasonable inference than that he was an active free-willed participant in the crime. The conclusion should be well-nigh inescapable other than by resorting to naivety or fantasy.

■ In this process particular regard should be given to analyzing the witness's

own testimony. Complicity of one not physically present at the commission of the crime should not be deemed a question of law where but a single circumstance would admit of an inference of participation. Newsum v. State, 10 Ala.App. 124, 65 So. 87 (hn. 2).

The testimony of the accomplice as evidence remains, as it were, inchoate to be quickened only by other evidence. In effect, it remains in limbo as no evidence at all.

Thus, in cases such as *Doss,* supra, Smith v. State, 230 Ala. 413, 161 So. 538, Berry v. State, 231 Ala. 437, 165 So. 97, Skumro v. State, 234 Ala. 4, 170 So. 776, Slayton v. State, 234 Ala. 1, 173 So. 642, Burns v. State, 246 Ala. 135, 19 So.2d 450, Sorrell v. State, 249 Ala. 292, 31 So.2d 82, we find statements that whether or not there is *any* corroborative evidence is a question of law.

■ If this legal question evokes an affirmative answer, the cause goes to the jury with proper charges as to how to weigh the evidence. McElroy, supra, § 300.01(16). Should there be no such evidence, the court should grant the defendant's request for the affirmative charge.

■ This cause is outwardly complicated by the purported corroboration of one witness by another whose conduct seems less heinous. Yet we consider that Weldon on the undisputed evidence was in law an accomplice. Morris v. State, 17 Ala.App. 126, 82 So. 574; Lotz v. State, 23 Ala.App. 496, 129 So. 305; People v. O'Farrell, 175 N.Y. 323, 67 N.E. 588.

For a similar case, see People v. Dailey, 179 Cal.App.2d 482, 3 Cal.Rptr. 852.[4]

Hite testified that Weldon took a fourth of the spoils on two occasions and that he

helped carry the loot to Green. These acts are the only parts of Hite's testimony, where it relates to Weldon being present, which Weldon denied.

Throughout Weldon was in control of his own car. He testified as to no act which even hints at his being threatened or in any other way being caused to act against his will. He waited long intervals for the others and then drove them away.

Accordingly, on the instant record, the affirmative charge was due to have been given the defendant.

The judgment below is due to be reversed and the cause there remanded for trial de novo.

Reversed and remanded.

stated in People v. Mullens, 292 N.Y. 408, 55 N.E.2d 479; Spears v. State, 89 Okl. Cr. 321, 207 P.2d 363; contra, Greeson v. State, 90 Ga.App. 57, 81 S.E.2d 839, "where the crime is proved."
In State v. Williamson, 42 Conn. 261, "Merely adding to the number of broken reeds gives no increase of strength."

---

4. As to one accomplice's testimony not corroborating that of another see also: 23 C.J.S., Crim.L. 812(4) j; People v. Clapp, 24 Cal.2d 835, 151 P.2d 237; State v. Rose, 75 Idaho 59, 267 P.2d 109; People v. Gibbons, 281 A.D. 759, 118 N.Y.S.2d 47, citing People v. O'Farrell, 175 N.Y. 323, 67 N.E. 588; rule also