Appellant was convicted of murder in the second degree and his punishment was fixed by the jury at fifteen years in the penitentiary. At arraignment, in the presence of his counsel, appellant entered a plea of not guilty. Following sentencing, he gave notice of appeal. An appeal was ordered in forma pauperis, wherein appellant is represented by trial counsel.
Appellant was charged by indictment with the unlawful killing with malice aforethought but without premeditation and deliberation of James L. "Pop" Loden, by pushing, throwing or otherwise causing him to fall into a body of water or the Black Warrior River whereby he drowned.
Appellant alleges two points of error in the actions of the trial court: (1) That the trial court erred in refusing to charge the jury on the law of accomplices and (2) that it was reversible error to deny appellant's request to examine the portion of a police report used by a witness to refresh his recollection. The sufficiency of the evidence is also raised by means of appellant's motion to exclude the State's evidence and request for the affirmative charge, both of which were denied by the trial court.
The chief witness for the State was Gail Cooley. Ms. Cooley testified that, on September 10, 1977, she and appellant, along with "Pop" Loden, Cliff Holmes and Sonny Bishop, left the Crescent Rooms Hotel in Bessemer around 1:30 or 2:00 in the afternoon. The five left the hotel in Cliff Holmes' car and Sonny Bishop was driving. They stopped and bought beer and wine, and spent the afternoon "riding and drinking."
According to the testimony of Ms. Cooley, they ended up in Tuscaloosa and went to a "place on the river." Bishop told Ms. Cooley, appellant and Loden to get out of the car and he and Holmes drove down the road, leaving the three at the river. While they were sitting there drinking and waiting for the others to return, the deceased began complaining and appellant told him to shut up and that if he didn't shut up, he was going to throw him in the river. Ms. Cooley testified that Loden continued to complain and appellant jumped up, grabbed him by his ankles, dragged him over, and threw him in the river. She ran over, saw him in the water, and started screaming. At that point, Sonny Biship came running back to the river.
Ms. Cooley testified that after James Russell threw the victim into the river, he said, "Let him drown." Then he picked up his bottle of wine, walked back over to where he had been sitting, and continued to drink. Ms. Cooley testified that she was still screaming and that Sonny Bishop told her there was nothing they could do. She and Bishop walked back to the car and left with Cliff Holmes, leaving appellant at the scene. Later that night she reported the incident to the police and returned to the scene on the following day with Officer Don Lake, an investigator from Tuscaloosa County.
On cross-examination, Ms. Cooley denied having argued with the deceased, "Pop" Loden, that afternoon and stated that she did not hear appellant argue with Mr. Loden. She testified that she drank between twelve and fourteen beers during the course of the afternoon and that she was five feet, four inches tall, and weighed one hundred and forty pounds. She denied that she told Loden to shut up or she would have someone throw him in the river, and that appellant had actually said, "Let him swim," not "Let him drown." She stated that all five members of the group were "pretty drunk," and there were parts of the day she didn't remember at all. *Page 345 
Dr. Henry Santina, pathologist, testified that, on September 11, 1977, he performed an autopsy and identified photographs as those taken of the body at the postmortem examination. The external examination showed abrasions and contusions consistent with those which might be sustained rolling down a rocky embankment, and there was a bruise on the head. The cause of death was asphyxia, consistent with drowning. Blood and tissue samples were turned over to the State Toxicologist.
On cross-examination Dr. Santina testified that a person with a blood alcohol level of .23 would be quite drunk and that ability to swim would be substantially impaired. He further testified that consumption of twelve to fourteen beers in a three and a half hour period would affect the perception and coordination of a five foot, four inch tall, one hundred and forty pound female.
Jim Britton, State Toxicologist, testified that the results of the test on the blood sample received from Dr. Santina at the postmortem examination showed a blood alcohol level of .23, which would indicate intoxication. On cross-examination, Britton testified that a female weighing one hundred and forty pounds and five feet four inches tall would have a blood alcohol level of approximately .33 after consuming twelve to fourteen beers in three and one-half hours.
Ron Fulgham, Deputy Sheriff of Tuscaloosa County, testified that on September 11, 1977, around 2:45 a.m., he and another officer saw appellant, James Russell, at Daniel's Creek on the Warrior River. He appeared to be drunk. The officers took appellant to the Tuscaloosa County Jail, but he was not arrested. Appellant went with the officers voluntarily.
Don Lake, Deputy Sheriff of Tuscaloosa County, testified that he went to Daniel's Creek on September 11, 1977, around 8:00 a.m., with other officers and Ms. Cooley. Lake made photographs of the scene, including drag marks leading to the river embankment and down to the river. He was present when the body was removed from the river. Officer Lake identified a photograph taken at the postmortem examination as that of the body removed from the river.
Daniel Branton, son-in-law of the deceased, identified the photograph previously identified by Officer Lake and Dr. Santina as that of the deceased, Larkin Loden.
Gail Cooley was recalled for further cross-examination and denied telling Sonny Bishop on the drive back to Bessemer that appellant "must have pushed Pop in the river" because she didn't think she did.
Sergeant Tom Eddings, of the Jefferson County Sheriff's Department, testified for the defense that, some time after 1:00 a.m. on September 11, 1977, he saw Gail Cooley at the Bessemer Police Department. She appeared to be intoxicated and told Eddings what had happened the previous day between appellant and the deceased. Sergeant Eddings testified that Ms. Cooley had difficulty relating the facts and appeared confused. On cross-examination, Eddings testified that her story never varied as to who actually pushed Loden in the river.
The testimony of Henry "Sonny" Bishop was substantially the same as that of Gail Cooley regarding the events of September 10, 1977, except that he did not witness the alleged drowning. He further testified that Ms. Cooley told him that "she had told Pop to shut up or she was going to have Jim throw him in the river." It was Bishop's opinion that all those present, including himself, were intoxicated.
Appellant, James Russell, testified in his own behalf. His version of the events of September 10, 1977, was substantially the same as previous witnesses until the point at which he got out of the car at the river. It was appellant's testimony that he got out of the car, sat down, drank some wine, and went to sleep. The others returned and said they would be back later to pick him up. The next thing he knew, the deputies came to pick him up.
Appellant testified that he did not throw anyone into the river or see anyone thrown in the river, and that he was "pretty well *Page 346 
intoxicated." On cross-examination, appellant testified that only he got out of the car at the river and that Gail Cooley and Loden left with the others.
Sonny Bishop was recalled for further cross-examination. He testified that appellant, Gail Cooley, and Pop Loden all got out at the river, and he and Cliff Holmes left together.
The State presented eyewitness testimony that appellant threw "Pop" Loden into the river, causing him to drown. The testimony of appellant controverted the eyewitness account. Conflicting testimony presents a question for the jury as to the defendant's guilt. The jury resolved this issue against the appellant. Morris v. State, 47 Ala. App. 132, 251 So.2d 629.
Appellant excepted to the Court's oral charge due to failure to charge on the law of accomplices and requested the following charges, which were refused:
 "DEFENDANT'S REQUESTED CHARGE NO. 2
 "I charge you, members of the jury, that you can not convict James Russell on the uncorroborated testimony of Gail Cooley."
 "DEFENDANT'S REQUESTED CHARGE NO. 6
 "The Court charges you, members of the jury, that the Defendant cannot be convicted upon the testimony of Gail Cooley unless corroborated by testimony of witnesses as to material elements of the offense, and that unless you find such corroboration you may not find the Defendant guilty based on that testimony of Gail Cooley."
Appellant contends the trial court erred in refusing requested charges 2 and 6.
The test for determining whether a witness is an accomplice is whether he or she could have been indicted and convicted for the offense charged, either as principal or accessory. Millerv. State, 290 Ala. 248, 275 So.2d 675. This determination is a question of law initially directed to the trial judge. Strangev. State, 43 Ala. App. 599, 197 So.2d 437. On the other hand, where there is conflicting evidence on the question of complicity, a question of fact is presented for the jury.Leonard v. State, 43 Ala. App. 454, 192 So.2d 461; Fairbanks v.State, 46 Ala. App. 236, 239 So.2d 908.
The only evidence presented at trial tending to show that Gail Cooley was an accomplice was the testimony of defense witness "Sonny" Bishop that Ms. Cooley had told the deceased to "shut up or she was going to have Jim (appellant) throw him in the river." This evidence was in conflict with Ms. Cooley's testimony that it was appellant who told Loden to "shut up or I'll throw you in the river."
This issue was submitted to the trial court on a motion to exclude the State's evidence as based on the uncorroborated testimony of an accomplice. The Court found that evidence demonstrating complicity had not been presented and overruled the motion.
The burden is on the defendant to show that another person was an accomplice to the charged crime. There is absolutely no evidence even tending to show that Ms. Cooley was an accomplice to this crime of murder. After appellant dragged the victim down the embankment and threw him in the water, Ms. Cooley screamed for help and that was her only connection with this crime. Sharpe v. State, 51 Ala. App. 534, 287 So.2d 245; Snowdenv. State, 27 Ala. App. 14, 165 So. 410; Davis v. State,257 Ala. 447, 59 So.2d 592.
The trial court did not err in refusing appellant's requested charges based on the assumption that Ms. Cooley was an accomplice as a matter of law. According to appellant's own testimony he did not throw the victim in the water and he did not know the deceased was thrown in the water.
Appellant further contends that the trial court erred in refusing to allow him to examine that portion of the investigation file referred to on direct examination by Officer Don Lake to refresh his recollection. Officer Lake had with him on the witness stand his investigation file, consisting of *Page 347 
some thirty to fifty pages. On cross-examination, Lake testified that he had referred to the first page of the report, which was a synopsis of the file, and to the page concerning the autopsy. Appellant requested to examine the pages referred to by Lake.
The witness was examined outside the presence of the jury and it was determined that he referred to his report to refresh his memory concerning what time he received the call to go to the scene, when the autopsy took place, and who was present. The Court refused to allow appellant to inspect the report and appellant excepted to this ruling.
For a better understanding of the issue presented we quote from the record:
"CROSS-EXAMINATION BY MR. SOGOL:
 "Q. Don, during the case of your testimony — during the course of your testimony on direct, did you refer to your case report?
"A. Yes, sir, I have.
 "MR. SOGOL: Your Honor, at this time we would request an opportunity to observe those things which Mr. Lake has referred to in his report.
 "MR. HUDSON: Your Honor, we object to any search of the officer's report. We would not object to him looking at any pages that the officer said that he referred to to refresh his memory in this case.
* * * * * *
 "THE COURT: We're going to take up the matter of the request to examine the case report of the officer made just prior to our recessing for lunch. Alright, if you would, state your motion again, Mr. Sogol.
 "MR. SOGOL: Your Honor, during the course of direct testimony, I observed Officer Lake referring and going through his case report. I have no way of knowing exactly which pages he referred to or anything like that. I would like the opportunity to go over the report for cross-examination at this point. We feel that since he has used the report to refresh his memory, I have a right to look at it.
"THE COURT: You have anything to ask him, Mr. Smith?
"MR. SMITH, Yes, sir.
"EXAMINATION BY MR. SMITH:
 "Q. Don, did you use any part of your report, a summation or a summary of your own work product when you were [on] the stand?
 "A. The only thing I looked at was the first page, a synopsis, and most of my looking through here was in anticipation of questions to come. I was trying to prepare myself for questions to come. And the only other page I looked at was the part concerning the autopsy. I wasn't exactly sure of the time when the autopsy took place, and that's what I was looking for.
"Q. Those are the only pages that you looked at?
 "A. Yes, sir, I looked at the first page of the synopsis to determine exactly when the calls came in, that information, and I further looked to see the time as to when the autopsy was and who was present at the autopsy.
"Q. Alright.
 "THE COURT: Alright, how many pages are contained in that report, Mr. Lake?
 "MR. LAKE: They aren't numbered, somewhere in the vicinity of thirty to fifty.
"THE COURT: Pages?
"MR. LAKE: Yes, sir.
 "THE COURT: As I understand from your testimony, that you referred to them specifically a couple of times to get dates and times?
 "MR. LAKE: Yes, sir, I looked at two different pages specifically. I had to turn through the whole thing. This thing is not in exact order as I laid it out, so when the secretary typed it up, she had some things that are not in context, and I had to look through the whole thing to find what I was looking for, but I looked specifically at two pages, two different pages.
"THE COURT: That was for date and time? *Page 348 
 "MR. LAKE: Yes, sir, and to determine who was present at the autopsy.
 "MR. SOGOL: Your Honor, I believe that Don has stated as far as looking at that particular point, he looked with reference to the autopsy thing to see who was there, but I believe he's also stated that he looked at the first page of the synopsis. Was that merely to get a date or to refresh your recollection?
 "MR. LAKE: That was merely to refresh my recollection the time, the times that the call came to me.
 "THE COURT: Well, I'll overrule the request. I don't think an isolated check would entitle you to peruse a thirty to fifty page work product.
 "MR. CHANDLER: Your Honor, could we ask a couple more questions.
"THE COURT: Yes, sir.
"EXAMINATION BY MR. CHANDLER:
 "Q. Don, you testified that you looked through the report in anticipation of questions that you expected were forthcoming?
"A. Yes, sir.
 "Q. And was that during the entire time that you were on the stand, or the majority of the time?
"A. The question's not exactly clear, Mr. Chandler.
 "Q. Well, you just testified that you had looked through, that you had looked through your report on occasion in anticipation of questions that you thought would be forthcoming, is that correct?
 "A. What I was concerned with was the time of my notification and the time of the autopsy, were the only two things I wasn't exactly sure of, and I was anticipating being asked those specific questions.
 "Q. Alright. And is that the only two things that you refreshed your remembrance of?
"A. Yes, sir.
"MR. CHANDLER: That's all.
 "THE COURT: Alright, I believe the defense has a copy of the autopsy report, is that not correct?
 "MR. SOGOL: Yes, sir, we also have a copy of the statement which Mr. Lake took from Mr. Russell.
 "THE COURT: Alright, I'll overrule the request to inspect Mr. Lake's report.
 "MR. SOGOL: We would respectfully except, Your Honor."
It is to be noted from the above quoted excerpts that appellant had been furnished copies of the autopsy report and appellant's statement. Officer Lake did not testify to any other material matters relating to the offense for which appellant was on trial that were in any manner harmful to him.
As this Court said in Cooks v. State, 50 Ala. App. 49,276 So.2d 634:
 "While it is true that a court's refusal to permit defense counsel to see and examine a memorandum used by the witness on the stand to refresh his memory constitutes reversible error, (McMurtrey v. State, 44 Ala. App. 658, 219 So.2d 414; Henry v. State, 46 Ala. App. 175, 239 So.2d 318) yet the rule is subject to reason and the whole of the record convinces us that there was no error in this ruling of the Court. . . ." (Emphasis supplied)
We hold the trial court was correct in not allowing appellant to make an unwarranted excursion into the work product of the investigating officer in this case, which consisted of thirty to fifty pages, when he referred to his report on the witness stand for only two innocuous purposes, viz., to refresh his memory as to the time the call relative to the crime was received by him and to determine who was present at the autopsy.
We have carefully searched the record for errors injuriously affecting the substantial rights of the appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur. *Page 349