[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 114 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 115 
 ON APPLICATION FOR REHEARING
This Court's original opinion of February 15, 1991, is withdrawn and the following opinion is substituted therefor.
Grady Archie Bankhead was convicted of the capital offense of murder during a robbery in the first degree. § 13A-5-40(a)(2),Code of Alabama 1975. He was given a bifurcated trial in accordance with § 13A-5-43. After the punishment phase of the trial, the jury returned its advisory verdict recommending death, with 11 votes "for death" and 1 vote "for life without the possibility of parole."
At sentencing, the trial court, in compliance with §13A-5-47, specifically found the existence of two aggravating circumstances and no mitigating circumstances. Bankhead was sentenced to death for the robbery-murder of Jack David McGraw. See the trial court's order attached as an appendix to this opinion. The Court of Criminal Appeals affirmed the conviction *Page 116 
and the sentence. Bankhead v. State, 585 So.2d 97 (Ala.Cr.App. 1989).
Along with Bankhead, two other defendants were charged with the murder.[1]
 FACTS
The Court of Criminal Appeals set out the facts inBankhead v. State, 585 So.2d at 98-99. However, we feel it necessary to recite the facts as found by that court in order to better present the issues in this case:
 "The evidence tended to show that on the morning of May 26, 1986, Jimmy Davenport and his brother-in-law, James Bynum, met Gary Leon Brown and the appellant at the appellant's house and set out to go fishing. They fished for most of the day and drank beer and whiskey while they did so. Around the middle of the afternoon, the four stopped fishing and went to a bar and drank for about three more hours.
 "Sometime during the afternoon, Bynum suggested that they go to the trailer of Jack David McGraw. On the way to the trailer, Brown and Bynum talked about killing a 'queer,' but assured Davenport that all he would have to do was drive. The appellant asked Bynum if he could hit hard and said he wanted Bynum to 'take the old guy out with one punch.' The appellant also said that if Bynum could not do so, that the appellant could, to which Bynum replied, 'I'm sure I can do it. I can hit hard.'
 "When the four men reached the trailer, Davenport stayed in the car. The others got out, walked to the door, and knocked. McGraw answered the door and invited them in; however, they soon came back out. As they were walking out, the appellant grabbed McGraw and threw him to the ground. Bynum and Brown then started punching McGraw, and continued to do so until he was unconscious. The three men then pulled him back into the trailer and closed the door.
 "After about 15 or 20 minutes, the appellant, Bynum, and Brown came out of the trailer carrying various items. They were covered with blood. The appellant told Davenport to 'shut up' or he would 'get the same as the old man.' The four men then left in the car.
 "They drove to the appellant's house, where they began unloading the items from the car. Among the items stolen were stereo equipment, speakers, a VCR, and a microwave oven. Blanche Bankhead, who was at that time the appellant's wife, overheard the appellant say to Brown, 'Are you sure he's dead?' Brown answered, 'Yes, I stabbed him and stabbed him and stabbed him. I thought he was dead. He kept trying to get up.' The appellant said, 'We've got to make sure he's dead.'
 "The appellant's wife also heard the men re-creating what had happened. Brown said, 'when Archie handed me that knife, he told me to cut — you have to cut his throat.' To this, the appellant replied, 'You weren't doing it right. I had to take the knife and slice his jugular vein.'
 "While still at the appellant's house, Brown pulled out the victim's wallet; it was decided that the four would divide up the money in it. Then the appellant said that they should burn their clothes, so they made a pile of them, poured gasoline on the pile, and set them afire. Davenport, who looked scared, said 'I have got to get out of here.' The appellant threatened him, saying that if he told anybody, the appellant would find him.
 "Later that night, the appellant and Brown went to the apartment of Michael Wayne Lotz and left a television there until the following day, when the appellant removed it. The next day, the appellant left another television at Lotz's *Page 117 
apartment. The appellant later told Lotz that Brown had been arrested by the police for a murder in Pinson; that he had gotten the television by robbing a man in Blount County; and that Lotz should take the television to the woods and burn it.
 "Neighborhood children returning Jack McGraw's dog to his yard discovered his body in the trailer on the afternoon of May 27, 1986. An autopsy revealed numerous stab wounds, including 59 to the back, 16 to the neck area, and 3 to the face. Both the carotid artery and the jugular vein on the left side of the neck had been cut. All wounds were pre-mortem. The cause of death was loss of blood due to the cut and stab wounds.
 "On May 29, 1986, the appellant left his house and did not return. He was arrested in Mobile on July 13, 1986, at which time he made a tape-recorded statement to law enforcement officers. He admitted that he had gone to McGraw's trailer with Davenport, Bynum, and Brown for the purpose of robbing McGraw. While they were in the trailer, McGraw emerged from his bedroom and tried to stop them. According to the appellant, Brown then attacked McGraw with a knife, stabbing him to death."
In reviewing a death penalty case, this Court may notice any plain error or defect in the proceeding under review, regardless of whether it was brought to the attention of the trial court. Ex parte Waldrop, 459 So.2d 959 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1984). See also Rule 45A, A.R.App.P. This Court may take appropriate appellate action whenever the error "has or probably has adversely affected the substantial right of the appellant." Rule 45A, A.R.App.P. "Plain error" arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceeding. UnitedStates v. Chaney, 662 F.2d 1148, 1152 (5th Cir. 1981). See alsoEx parte Womack, 435 So.2d 766 (Ala. 1983), cert. denied,464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983).
 I.
On application for rehearing, Bankhead argues that he had standing to challenge the prosecutor's allegedly discriminatory use of peremptory challenges. At Bankhead's trial, the prosecutor peremptorily challenged 8 of the 10 blacks on the jury panel. We note that 2 black jurors remained on Bankhead's jury.
No objection was made at trial. However, under the "plain error" doctrine of Rule 45A, A.R.App.P., we addressed the issue ion Part I of our opinion of February 15, 1991. We held that Bankhead did not have standing under Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to challenge the prosecutor's use of peremptory challenges as a violation of the Fourteenth Amendment. We noted that the Supreme Court had granted certiorari review in Powers v. Ohio, 493 U.S. 1068,110 S.Ct. 1109, 107 L.Ed.2d 1017 (1990), in which a white defendant challenged the striking of black veniremen from his jury as a violation of the Equal Protection Clause. Justice Maddox dissented, expressing the view that Bankhead did have standing to make his Batson challenge.
The Supreme Court has recently decided Powers v. Ohio, ___ U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), holding that a defendant in a criminal case can raise a third-party equal protection claim on behalf of jurors excluded by the prosecution because of their race.
Based on Powers, we must now hold that Bankhead, a white, has standing under the Equal Protection Clause to challenge the prosecutor's allegedly racially motivated use of peremptory challenges. Bankhead's case will be remanded to the Jefferson County Circuit Court for a hearing on this issue. If the prosecution cannot provide racially neutral reasons for the use of peremptory challenges against black venire members, then Bankhead must receive a new trial. The trial court shall make a due return to this Court indicating its action on remand. *Page 118 
 II.
Bankhead argues that a group of photographs introduced at the guilt phase of his trial and a group of photographs introduced during the sentencing phase were inadmissible.
Bankhead argues that certain photographs introduced during the guilt phase of his trial were extraordinarily prejudicial and had minimal or no probative value.
Photographs are admissible into evidence within the discretion of the trial judge and will be reviewed on appeal only to determine if there has been an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882
(1973).
Photographs are admissible if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered.Baldwin v. State, 282 Ala. 653, 213 So.2d 819 (1968). The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried.Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd, Exparte Magwood, 494 So.2d 154 (Ala. 1986), cert. denied, Magwoodv. Alabama, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
Some of the photographs in issue here depicted wounds to the back and neck area of the deceased. The State argues that the photographs were credible evidence for the jury to view in order to determine whether a pocket knife or a larger knife that was found at the scene could have inflicted the depicted wounds. Based on the record, we agree.
Bankhead next asserts that color photographic slides introduced during the sentencing phase of the trial were grossly inflammatory. He claims that the introduction of the slides violated the guarantee to every person convicted of capital murder that no death sentence can be imposed "under the influence of passion, prejudice, or any arbitrary factor." § 13A-5-53(b)(1), Code of Alabama 1975. The slides shown to the jury depicted the victim's wounds and were projected on a large screen in front of the jury.
The slides were of the photographs that had been introduced into evidence earlier during the sentencing phase. They did not distort the facts or mislead the jury in any way. See,Goffer v. State, 430 So.2d 896 (Ala.Cr.App. 1983). We hold that the slides were properly admitted.
Bankhead also argues that some of the slides distorted the victim's wounds. Some of the slides depicted wooden probes inside the wounds on the victim's back. There were 59 wounds to the victim's back. Wooden probes were placed inside the wounds to show the depth and the angle of the wounds. The purpose of these slides was to show the frenzied nature of the stab wounds.
The purpose of the slide presentation was to prove aggravating circumstances. The aggravating circumstance the State sought to prove was that this capital offense was "especially heinous, atrocious or cruel compared to other capital offenses." § 13A-5-49(8), Code of Alabama 1975. The trial court charged the jury before the slide presentation that the slides were being shown only to prove that this aggravating circumstance existed.
This Court has held that a capital murder by multiple stab wounds is especially heinous, atrocious, or cruel. Dunkins v.State, 437 So.2d 1349 (Ala.Cr.App. 1982), aff'd, Ex parteDunkins, 437 So.2d 1356 (Ala. 1983). As noted earlier, photographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood, 494 So.2d at 141. The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id. The rules of law concerning photographs also apply to photographic *Page 119 
slides. Goffer v. State, supra. Thus, the photographic slides were properly admitted.
 III.
Bankhead argues that his conviction was based upon the uncorroborated testimony of an accomplice (Davenport) and that the trial court erred in failing to instruct the jury on the need for corroboration of accomplice testimony.
Section 12-21-222, Ala. Code 1975, provides:
 "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
When there is a doubt or dispute concerning the complicity of a witness and the testimony is susceptible to different inferences on that point, the question is for the jury. Exparte Bell, 475 So.2d 609 (Ala. 1985) cert. denied,474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985). In this case, it is at least in dispute as to whether Davenport was an accomplice. Davenport testified that he drove the three defendants to and from the scene of the crime and also received a portion of the money stolen from the victim, but did not willingly participate in the robbery and killing. Thus, it would be for the jury to decide whether Davenport's testimony as to his participation was believable. When a witness denies willing participation in the crime charged against the defendant, the issue of his being an accomplice is a question of fact for the jury. Ex parteBell, 475 So.2d at 612, citing Yarber v. State, 375 So.2d 1229
(Ala. 1978).
This Court has held that, assuming a witness is an accomplice, the question of whether there is sufficient corroborating evidence to support the witness's testimony, as required by § 12-21-222, Code of Alabama 1975, is a question of law. Ex parte Bell, 475 So.2d at 613. The evidence establishes that there was sufficient corroboration of Davenport's testimony. Therefore, the trial court did not commit reversible error in not instructing the jury on corroboration of accomplice testimony.
To corroborate means to make more certain, to confirm, or to strengthen. Lewis v. State, 426 So.2d 932 (Ala.Cr.App. 1982), cert. denied, 426 So.2d 938 (Ala. 1983), and the corroborative testimony need not be strong or sufficient in and of itself to support a conviction. Andrews v. State, 370 So.2d 320
(Ala.Cr.App. 1979), cert. denied, 370 So.2d 323 (Ala. 1979). Corroborative evidence need not directly convict the accused of the crime, but need only tend to do so. Id. The jury decides whether a witness is an accomplice and, if so, whether his testimony has been properly corroborated. See Leonard v. State,43 Ala. App. 454, 192 So.2d 461 (1966).
Certainly, if Davenport was an accomplice, there was evidence to corroborate his testimony and to support Bankhead's conviction. Bankhead's own statements placed him (Bankhead) at the scene where the victim was killed. Bankhead testified that Davenport remained in the automobile during the murder. Also, Bankhead testified that no conversation occurred in the car on the way to the victim's trailer. If Bankhead is believed, this implies that Davenport did not know that a murder was to be committed. Testimony from Blanche Bankhead indicates that Bankhead was in possession of property like that taken from the victim on the evening of the murder. Her testimony was that Bankhead and the others were covered with blood when they arrived at the Bankhead home and that she overheard Bankhead say that he participated in the murder by cutting the victim's throat. Therefore, the trial court did not err in refusing to charge the jury on accomplice liability.
 IV.
Bankhead contends that reversible error occurred in the charge to the jury during the guilt phase of the trial. Specifically, Bankhead argues that the jury instruction *Page 120 
concerning intoxication violated his rights to a fair trial.
Bankhead asserts that the judge improperly charged the jury on intoxication by reading from an appellate court decision. The judge stated as follows:
 "Now, in assessing whether or not the defendant's actions were intentional versus reckless, what you people have to do is consider the evidence relative to the defendant's alleged voluntary intoxication.
 "Should you believe from the evidence that the defendant was so drunk or intoxicated at the time of the crime that he was incapable of formulating a specific intent, then you could not convict of the offenses of felony murder or capital murder.
 "But what I would like to do is read to you what our Supreme Court of Alabama has stated in this area. Page 682 of the Crosslin case; 446 So.2d, page 682. . . . 'When an offense consists of an act committed with a particular intent, when a specific intent is of the essence of the crime, drunkenness as affecting the mental state of the condition of the accused becomes a proper subject to be considered by the jury in deciding the question of intent. Although drunkenness in point of law constitutes no excuse or justification for a crime, still when the nature and essence of the crime is made by law to depend upon the particular state and condition of the defendant's mind at the time and with reference to the act done, drunkenness, as a matter of fact, affecting such state and condition of the defendant's mind is a proper subject for consideration and inquiry by you people, the jury. The question is in such cases, 'What is the mental status?'
 "In the same case, the Court goes on to say: 'The degree of intoxication necessary to negate specific intent and thus reduce the grade of an offense must amount to insanity. Mere drunkenness voluntarily produced is never a defense against a criminal charge and can never palliate or reduce the grade of an offense unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act.
 " 'Partial' — in the same case — 'partial intoxication will not avail to disprove the specific intent. The intoxication must be of such character and extent so as to render the accused incapable of discriminating between the right and wrong, stupefaction of the reasoning faculty.'
 "Now, I am about to quit too. You people assess the evidence, you see. You do this relative to the voluntary intoxication or drunkenness of the accused and consider it in light of whether or not the defendant was capable of acting intentionally. An intentional act being required for conviction of capital or felony murder.
 "If you do not find that the defendant's actions were intentional because of his alleged drunkenness, but because of his drunkenness he could not formulate a specific intent, then you must consider whether or not the defendant caused McGraw's death by his recklessness. And drunkenness is no defense against the charge of recklessness.
 "Indeed, one who voluntarily intoxicates himself or ingests himself with alcohol or whatever, does act recklessly by operation of law. So, voluntary intoxication is no defense for reckless conduct."
(Reporter's Transcript at 1014-16.)
In Jones v. State, 362 So.2d 1303, 1315 (Ala.Cr.App. 1978), the Court of Criminal Appeals held that the intoxication "must be of such character and extent as to render the accused incapable of consciousness that he is committing a crime." Also, this Court has stated that "[m]ere drunkenness, voluntarily produced, is never a defense against a criminal charge, and can never palliate or reduce the grade of an offense, unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act." Gautney v. State, 284 Ala. 82, 88, 222 So.2d 175 (1969, quoting Walker v. State, 91 Ala. 76, 82, 9 So. 87, 89 (1890) (emphasis omitted). Intoxication "must be so excessive as to paralyze the mental facilities, *Page 121 
and render the accused incapable of forming or entertaining the design to take life." Id. The degree of intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity. Crosslin v. State, 446 So.2d 675
(Ala.Cr.App. 1983), appeal after remand, 489 So.2d 680
(Ala.Cr.App. 1984), citing Maddox v. State, 31 Ala. App. 332,344, 17 So.2d 283, 285 (1944) (other citations omitted).
Bankhead contends that the court's instruction requiring that the jury, in order to find a drunkenness defense applicable, had to find Bankhead insane due to intoxication, was prejudicial. We disagree. In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. Lister v. State,437 So.2d 622 (Ala.Cr.App. 1983). The same standard is applicable in homicide cases. Crosslin, supra. Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A-3-2. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. A jury is capable of determining whether a defendant's intoxication rendered it impossible for the defendant to form a particular mental state. The trial court's instructions on intoxication were proper under Alabama law.
 V.
Bankhead argues that testimony from his wife should not have been admitted. We disagree.
First, Bankhead contends that Blanche Bankhead should have been required to make an election to testify before trial. See cases construing § 12-21-227, Code of Alabama 1975. This is incorrect. Testimonial privilege status does not apply to persons who are divorced at the time of trial. Ex parte Arnoldv. State, 353 So.2d 524 (Ala. 1977). See also, Rogers v. State,417 So.2d 241, 248 (Ala.Cr.App. 1982). The Bankheads were divorced before the trial began.
Second, Bankhead argues that comments by Blanche Bankhead made during the pretrial investigation violated the spousal testimonial privilege. This is also incorrect. The spousal testimonial privilege does not apply to pretrial criminal investigations. As the State argued, § 12-21-227, by its language, deals with a privilege to testify or not to testify.
Bankhead also argues that the communications made during the marriage and as to which his former wife testified were privileged and thus inadmissible. This argument has no merit. The communication occurred in the presence of third persons. It is well-settled law in Alabama that a marital communication loses its confidential character if it is made in the presence of third parties. Caldwell v. State, 146 Ala. 141, 41 So. 473
(1906); Epps v. State, 408 So.2d 562 (Ala.Cr.App. 1981). If a spousal communication is not confidential, it loses the status of a privilege. Caldwell, supra.
 VI.
Bankhead contends that the State failed to reveal that it had made a deal with Jimmy Davenport and Blanche Bankhead in exchange for their testimony.
In Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763,31 L.Ed.2d 104 (1972), the Supreme Court held that a jury was entitled to know of deals or consideration given in exchange for testimony. The Court held that jury knowledge of a deal between the State and a witness is relevant to an issue of the witnesses's credibility. Id.
There was evidence that Jimmy Davenport lied to officers on several occasions regarding this case and that one of the officers then told Davenport that, unless he told the truth, he would be prosecuted for capital murder. This is the only evidence of a "deal" between the State and *Page 122 
Davenport. In closing argument, the State admitted that avoiding a capital charge was a motive for Davenport to lie. The State also argued that Davenport had not been charged with a crime and that Davenport's testimony was not in exchange for a deal. Bankhead's own testimony indicated that Davenport was not guilty of capital murder. (R.T. 463-64.) There was no other evidence of a "deal" between Davenport and the State in exchange for his testimony.
After reviewing the record, we find no evidence that Blanche Bankhead testified pursuant to a deal with the State. Blanche Bankhead allegedly had outstanding criminal charges pending against her. Even if charges were pending against her, this fact would not prove that a deal existed between her and the State. Although during cross-examination she was asked about past convictions, she was not asked about an arrest for these pending charges. There was no other evidence presented concerning any alleged deals with Blanche Bankhead.
 VII.
Bankhead argues that the admission, for impeachment purposes, of his prior convictions was improper. Bankhead contends that his prior convictions, four convictions of obtaining merchandise by false pretenses and two convictions of sale of a controlled substance, were not crimes of moral turpitude and were too remote to be admissible.
Generally, a defendant who testifies in his own behalf during criminal prosecution can be questioned on cross-examination about convictions of crimes involving moral turpitude. Evidence of prior criminal acts, which is admitted for impeachment purposes, relates to the witnesses's veracity. § 12-21-162,Code of Alabama 1975; Ex parte McIntosh, 443 So.2d 1283 (Ala. 1983).
A crime of moral turpitude is one that is contrary to justice, honesty, principle, or good morals; an act of baseness, vileness, or depravity in the private and social duties that a man owes his fellowman or society. Sims v.Callahan, 269 Ala. 216, 112 So.2d 776 (1959). It is a crime that is immoral in itself, regardless of the fact that it is punishable by law. Sims, supra; Ex parte McIntosh, supra.
Bankhead had previously been convicted of using a credit card to obtain merchandise under false pretenses. Larceny (now known in our Code as theft), petit or grand, is a crime of moral turpitude and a conviction of larceny may be used for impeachment purposes. Stahlman v. Griffith, 456 So.2d 287 (Ala. 1984). Bankhead also had been convicted twice of the unauthorized sale of a controlled substance, which is a crime of moral turpitude.
As to the issue of remoteness, the trial court has discretion in deciding whether a conviction is too remote in time to be admissible for impeachment purposes. Bankhead's convictions were 12 years old. The admission of evidence of crimes 20 years old, Davenport v. State, 50 Ala. App. 321, 278 So.2d 769 (1973), and even 30 years old, Lanier v. State, 43 Ala. App. 38,179 So.2d 167 (1965), has been upheld as within the trial court's discretion.
 VIII.
Bankhead alleges that he was absent during a pretrial suppression hearing and argues that it was a violation of his constitutional rights to conduct the hearing in his absence. Bankhead made this claim during the hearing on a motion for a new trial. However, the record clearly shows that Bankhead was present at the suppression hearing, along with the other two defendants. (R.T. 40-41, R.T. 1133-34.)
 IX.
Bankhead contends that the testimony by Blanche Bankhead was hearsay and was not within any exception to the hearsay rule. We find that her testimony fit within the coconspirator exception to the hearsay rule.
Blanche Bankhead testified that when Bankhead, the other two defendants, and Davenport arrived at the Bankhead home, *Page 123 
she heard Bynum say "And Archie handed me the knife, said you have to cut his throat." (R.T. 495.) She also testified that Bankhead responded to Bynum's statement, saying "You weren't doing it right. I had to take the knife and slice his jugular vein." (R.T. 497.) These statements fall within the coconspirator exception to the hearsay rule.
Any act or statement by an accused's coconspirator in the commission of the crime, done or made before the commission of the crime, during the existence of the conspiracy, and in furtherance of a plan or design, is admissible. Leonard v.State, 459 So.2d 970 (Ala.Cr.App. 1984). "If it is reasonably inferable from the evidence that the conspiracy embraced the disposition, or the division among the conspirators, of the fruits of the crime, an act or statement of a coconspirator in furtherance of such disposition or division is admissible against the accused notwithstanding the fact that the statement also referred to an act committed in the execution of the crime." C. Gamble, McElroy's Alabama Evidence, § 195.03(6) (3d ed. 1977); see also Ingle v. State, 415 So.2d 1225 (Ala.Cr.App. 1982); Williams v. State, 383 So.2d 547 (Ala.Cr.App. 1980), aff'd, Ex parte Williams, 383 So.2d 564 (1980), cert. denied,449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980).
Proof of a conspiracy must exist, Nance v. State,424 So.2d 1358 (Ala.Cr.App. 1982), but the prosecution need only present prima facie evidence independent of the statements made by the coconspirator to establish that the conspiracy existed. Brightv. State, 485 So.2d 398 (Ala.Cr.App. 1986).
In the instant case, a finding of the existence of the conspiracy was supported by evidence other than the coconspirators' statements. Jimmy Davenport testified that Bankhead, Bynum, and Brown first discussed killing McGraw and then went to McGraw's trailer, grabbed him, beat him, and pulled him inside the trailer. They later emerged from the trailer covered with blood and carrying appliances. The group went to the Bankhead home, where they discussed what they (Bynum, Bankhead, and Brown) had done. Blanche Bankhead testified that when the three defendants and Davenport arrived at her home, they were carrying appliances and were covered with blood. The group divided up the money stolen from the victim. In furtherance of their plan, Brown and Bankhead took some of the appliances to another person's apartment. Blanche Bankhead's testimony fit within the coconspirator exception to the hearsay rule. X.
Bankhead makes three arguments relative to the jury charges during the sentencing phase, concerning § 13A-5-49(8), Code ofAlabama 1975. Under § 13A-5-49(8), the jury, in a capital case, can consider whether "the capital offense was especially heinous, atrocious or cruel compared to other capital offenses." The trial judge charged the jury as follows:
 "I told you earlier there were two aggravating circumstances that you may consider in this case if you are convinced beyond a reasonable doubt or to a moral certainty based on the evidence that such circumstances do exist.
 "Number one: That the capital offense was committed while the defendant was engaged or was an accomplice in the commission of a robbery.
 "Number two: The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.
 "Now, what I did not mention earlier, I don't believe, what do we mean by this 'second aggravating circumstance'? The term 'heinous' means extremely wicked or shockingly evil. The term 'atrocious' means outrageously wicked and violent. The term 'cruel' means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others.
 "What is intended to be included in this aggravating circumstance is that case where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital cases. *Page 124 
 "For a capital case to be especially cruel, it must be a conscienceless or pitiless crime which is unnecessarily torturous to the victim.
 "All capital cases are heinous, atrocious and cruel to some extent. What is intended to be covered by this aggravating circumstance is only that case in which the degree of heinousness, atrociousness or cruelty exceeds that which will always exist when a capital offense is committed.
 "The burden of proof is on the State to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance considered by you in determining what the punishment is to be in the case. And as I said, this means that before you can even consider finding that the defendant's punishment be death, each and every one of you must be convinced beyond a reasonable doubt, based on the evidence, that at least one or more of the aggravating circumstances exist.
 "In deciding whether the State has proven beyond a reasonable doubt the existence of any aggravating circumstance, you should bear in mind again the definitions given you earlier." (R.T. 1092-94.)
First, Bankhead argues that the trial judge erred in failing to adequately explain the "unnecessarily torturous" finding required by State and Federal Constitutions. Second, Bankhead contends that the trial court's instructions, by not restricting the "especially heinous, atrocious or cruel" aggravating circumstance to Bankhead's personal conduct in the crime, subverted the mandate for individualized capital sentencing. Third, Bankhead asserts that in order to find an aggravating circumstance under § 13A-5-49(8), the jury needs evidence of other capital offenses to compare with the instant capital offense.
Bankhead's first argument is that the jury charges concerning § 13A-5-49(8), were improper because the jury was not required to find that the crime was "unnecessarily torturous" to the victim before applying § 13A-5-49(8). Bankhead relies heavily on Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853,100 L.Ed.2d 372 (1988). In Maynard, the Supreme Court held that Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance was unconstitutionally vague because it gave little guidance to the jury's discretion in deciding whether to impose the death penalty. In that case, the jury was given few or no limiting instructions as to the meaning of the words "especially heinous, atrocious, or cruel." Also, the state appellate court in Maynard had failed to declare any standard of review in affirming the death penalty. The Oklahoma appellate court had merely affirmed the imposition of the death penalty because the facts of the case were so plainly heinous, atrocious, or cruel.
In Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981), this Court held that the standard applicable to the "especially heinous, atrocious, or cruel" aggravating circumstance under §13A-5-49(8) is that for a crime to fit within that section it must be one of "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."
This Court has affirmed a decision by the Court of Criminal Appeals that addressed jury instructions on this aggravating circumstance. The jury instructions in Bui v. State,551 So.2d 1094 (Ala.Cr.App. 1988), aff'd, Ex parte Bui, 551 So.2d 1125
(Ala. 1989), were very similar to the jury instructions in the present case. The jury charges in the instant case clearly meet the Kyzer standard.
The trial court specifically found that two of the aggravating circumstances existed and that no mitigating factors were present. The trial court did not specifically cite the Kyzer standard in its findings but stated that the findings were based on "applicable case law." (R.T. 1180.) The Supreme Court has indicated that, in this context, it can be presumed that the trial court has applied a previously announced standard. See Walton v. Arizona, ___ U.S. ___, ___,110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990). Also, the Court of Criminal Appeals expressly relied upon the *Page 125 Kyzer standard, which limits § 13A-5-49(8) to those killings that are unnecessarily torturous to the victim.
Second, Bankhead argues that the trial court incorrectly charged the jury as to Bankhead's personal participation in the murder. Bankhead contends that the trial court did not sufficiently restrict the applicability of § 13A-5-49(8) to Bankhead's conduct in the crime. This is not a valid argument.
In § 13A-5-49(8), the emphasis is on the manner of the killing, not on the defendant's actual participation. In the sentencing phase of a bifurcated trial under § 13A-5-43, the jury has already determined that the crime is a capital offense. That is, the jury has determined that the killing was intentional, because an intentional killing is a necessary element of capital murder. The State does not have to prove that the defendant inflicted the wounds or assign any particular wound to the defendant. Once the jury determines that the defendant has committed a capital offense, the sentencing phase can begin. It is during the sentencing phase that the jury considers whether "the capital offense was especially heinous, atrocious or cruel compared to other capital offenses." § 13A-5-49(8).
Third, on the issue of aggravating circumstances, Bankhead suggests that the jury should have had the opportunity to compare the capital offense in this case with other capital offenses for purposes of § 13A-5-49(8).
Although a very narrow and literal reading of the statute may suggest that such a comparison is required, it would be virtually impossible for the court to implement. Charging the jury on pertinent facts of "other capital cases" would unduly burden the court. It would be unworkable for the court and would thoroughly confuse the jury.
This Court has decided upon an approach for the purposes of § 13A-5-49(8). In comparing capital offenses for the purposes of determining whether a capital offense was "especially heinous, atrocious or cruel," the court uses the Kyzer
standard. Capital offenses falling under § 13A-5-49(8) are, pursuant to the Kyzer standard, those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Kyzer, 399 So.2d at 334. The trial court clearly followed the Kyzer standard in its instructions to the jury.
 XI.
Bankhead relies on Gardner v. Florida, 430 U.S. 349,97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), in arguing that the use of his presentence report was unconstitutional. He claims that the presentence report consisted primarily of biased statements made by his ex-wife, who was also a main witness for the State. He asserts that the report was improperly prepared and, therefore, that its use denied him due process and fair sentencing under state law and the Fourteenth Amendment.
Bankhead's reliance on Gardner is misplaced. In Gardner, the presentence report was not disclosed to the defendant. The Court in Gardner concluded that the defendant was denied due process when the death sentence was imposed, at least in part, based on information that he had had no opportunity to deny or to explain. In the instant case, the presentence report was fully disclosed to the defendant, as provided for in §13A-5-47(b), Code of Alabama 1975. Bankhead was given an opportunity during the final sentence proceeding to contest the information contained in the report. There was no objection made in the trial court on this issue. Thus, reversal is required only if plain error exists, and there was no plain error concerning the presentence report.
 XII.
Bankhead argues that the trial court erred in failing to immediately disqualify a juror who had a private conversation with the judge. During the trial, the judge was in the courtroom and a juror, who had remained in the jury room during the lunch recess, spoke to him. The juror stated that he did not remember much pretrial publicity about the case and that there had not been much press coverage of the trial. (R.T. 642-43.) The judge told him *Page 126 
that he could not discuss the case with him. The juror said he was a salesman and that he knew a local attorney. The juror also stated that he had been summoned for jury duty twice but had been released. The judge notified all parties as to the conversation. The judge offered to make the juror an alternate or to dismiss him altogether. The State and defense counsel agreed that there was no need for any action by the court. The defendant specifically declined to have the juror questioned at that time.
Later, the juror was questioned about the conversation. He acknowledged what the judge had said about the nature of the conversation. (R.T. 715-18.) The trial court then dismissed the juror, out of an abundance of caution.
The Supreme Court has held that an unrecorded ex parte communication between a judge and juror can be harmless error.Rushen v. Spain, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267
(1983). In that case, a juror had an ex parte communication with the judge. However, defense counsel was not made aware of the communication until after the trial was completed. The Court found the conversation to be innocuous because the participants did not discuss any fact in controversy or any law applicable to the case and, therefore, the communication could not have prejudiced the defendant.
In the instant case, the judge notified the defendant of the communication. The only part of the discussion that in any way related to the case concerned the juror's surprise as to the lack of pretrial publicity and press coverage during the trial. The judge then stated that he could not discuss the case. The parties to the conversation did not discuss any fact in controversy or any applicable law. Defense counsel was told about the communication and was offered the opportunity to question the juror at that point. Defense counsel specifically said he was satisfied at that point, and no further action was taken. Later, the juror was questioned and was dismissed and an alternate took his place. This occurred before the jury began deliberations. We see no prejudice to Bankhead caused by the delay in dismissing the juror.
Also, defense counsel failed to object to not having the juror removed immediately. Assuming, arguendo, that it was error to allow the juror to remain on the jury for that brief period of time after the conversation was made known but before deliberations began, it was invited error. An invited error is waived, unless it rises to the level of plain error.Johnson v. State, 507 So.2d 1337, 1344 (Ala.Cr.App. 1985), rev'd on other grounds, this issue reserved, Ex parte Johnson,507 So.2d 1351 (Ala. 1986). Here, it was not plain error to allow the juror to remain on the jury for a short period before dismissing him. If any error occurred, it was harmless.
 XIII.
Bankhead claims that his statement was obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), and Edwards v. Arizona, 451 U.S. 477,101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Bankhead alleges that he requested an attorney before he was questioned by the police. We find this claim to be without merit.
The record reflects that Bankhead never requested an attorney before making a statement. A police sergeant testified at the suppression hearing that Bankhead was given hisMiranda rights. (R.T. 43.) Bankhead also signed a waiver of his right to an attorney, before answering questions or making a voluntary statement. (R.T. 606-07.) Bankhead's statement was also recorded and transcribed. The transcript shows that Bankhead understood his rights and voluntarily waived them. (R.T. 1200.)
The question whether a confession is voluntary is initially to be determined by the trial court. Ex parte Singleton,465 So.2d 443 (Ala. 1985). Thereafter, the voluntariness, as affecting the credibility and weight to be given any statement that an accused has made, is a determination for the jury. Id.
The finding of the trial court will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Magwood, 494 So.2d at 136. Here, the evidence indicated that Bankhead did not request an attorney and that he voluntarily waived his *Page 127 
rights. The trial court's decision on the voluntariness of the statement was correct.
 XIV.
There are three issues presented here as to which we summarily approve the Court of Criminal Appeals' holdings: Whether there was prosecutorial misconduct, whether Bankhead had the intent to kill, and whether the judge erred in failing to strike a juror for cause. We find the ruling of the Court of Criminal Appeals to be correct on these three issues, which were specifically presented to this Court.
We find all other issues presented by the defendant to be without merit. We have also examined the record for plain error, and have found none.
APPLICATION GRANTED AS TO PART I; ORIGINAL OPINION AND DISSENTING OPINION WITHDRAWN; OPINION SUBSTITUTED; REMANDED.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, ADAMS, HOUSTON, STEAGALL and INGRAM, JJ., concur.
APPENDIX
STATE OF ALABAMA
VS.
 GRADY ARCHIE BANKHEAD In the Tenth Judicial Circuit of
the State of Alabama
Criminal Division
Case No. CC-86-3178
CC86-3178
In the Tenth Judicial Circuit of
The State of Alabama
Criminal Division
Case No. CC 86-3178
State of Alabama
vs.
Grady Archie Bankhead
ORDER OF THE COURT ON
IMPOSITION OF THE
DEATH PENALTY
Defendant Bankhead was charged by indictment with the capital offense of murder during a robbery in the 1st degree,13A-5-40(2), wherein one Jack David McGraw was intentionally killed.
A petit jury, duly impaneled and sworn as required by law, after hearing the evidence [and] the court's charge as to the applicable law, including the lesser included offense of felony murder and manslaughter, found the defendant guilty of capital murder.
The same jury, sequestered throughout the entire proceedings, heard evidence, counsel's argument and the court charge during the "punishment" phase and returned an advisory verdict [fixing] the defendant's punishment at death.
The vote was eleven for death and one for life without parole, as reflected in the verdict form and confirmed by individually polling the jury.
This court commends the respective attorneys for putting aside any attempt to emotionally influence the jury with passion, prejudice or other arbitrary factors in arriving at their advisory verdict.
The trial record abundantly supports the court's findings that the jury's advisory verdict was not imposed under the influence of passion, prejudice or any arbitrary factor.
 FINDINGS OF FACT FROM THE TRIAL
The court makes the following findings of fact from the evidentiary portions of the trial proceedings.
STATE'S CASE: The thrust of the state's case against defendant Bankhead was bottomed on Bankhead's inculpatory statement, the testimony of Jimmy Davenport and defendant's ex-wife, Blanche Bankhead.
BANKHEAD'S STATEMENT: The court admitted into evidence, over objections, defendant's July 15, 1986 inculpatory statement. The statement as a whole may be summarized thusly.
Defendant states that he knowingly accompanied his companions to the deceased's *Page 128 
home for the avowed purpose of burglarizing the home. Defendant goes [on] to state that he personally removed certain items from the deceased's home, that he observed co-defendant Brown subdue the deceased outside the trailer home, that he (Bankhead) assisted in pulling the deceased back into the trailer, that he observed Brown repeatedly stab the deceased, [and] that he continued to transport items out of the trailer after the deceased had been stabbed.
Quoting from defendant's statement at pages 5 through 8:
 "A: And uh, I don't remember who it was, one of them pointed at the t.v. so I just grabbed the wires and snatched on them, and I picked up the t.v. and started out the door and James was over getting a microwave thing and this man walked out of the bedroom door and when he did Gary jumped on him, and uh we went out the door and started loading up and when we come back in, that guy tried to get out the door or something. Gary pulled him back in and then uh they told me to get some beer or something out of the refrigerator and uh he got a stereo or something, James got another stereo and was carrying that out and I got a t.v., I didn't get no . . . the beer. I got another t.v. set and was carrying that out and we loaded it up in the car and then in a few minutes Gary come out and we got in the car and we left.
 "Q: Okay, now when y'all went in and started getting these items and Mr. McGraw came out, you said Gary jumped him . . . how did this take place?
"A: Just shoved him down.
"Q: Was this inside the trailer or outside?
"A: It was right at the door.
"Q: Did he fall inside the trailer or outside?
"A: He fell towards the outside of the trailer.
 "Q: All right, did he fall on out on the ground out there?
 "A: Yes, right past the steps. That's when Gary grabbed him by the legs like that and pulled him back in.
 "Q: All right, so when Gary first jumped Mr. McGraw you said he fell outside the trailer down on the ground there next to the steps, is that right?
"Q: And what did Gary do at that time?
"A: Uh, he just had a hold to him, you know.
"Q: Where was he holding him at?
 "A: Well at first he had him around the waist and then he had him around the neck area right around in here and then uh who was it, I had a t.v. in my hands, uh the next thing I remember was Gary grabbing me [him?] by the legs like this and pulling him up back into the trailer.
"Q: How was Mr. McGraw killed?
"A: With a knife.
"Q: Whose knife was it?
"A: It was a pocket knife of mine.
"Q: All right, how did Gary get your pocket knife?
"A: Fishing that day.
"Q: Where is that knife now?
 "A: I don't know. I don't have any idea, things . . . when I seen all that stuff go crazy like that, uh I don't know what happened to the knife.
 "Q: Okay, so Gary had your knife and what happened with the knife and Mr. McGraw?
"A: What happened with it?
"Q: Yeah, when did the cutting start?
"A: When he pulled him back inside the trailer.
"Q: Inside the trailer or outside?
 "A: I don't remember him doing any outside, I remember it inside.
 "Q: Okay, what did he do when he got back inside the trailer?
"A: Oh, just crazy. *Page 129 
"Q: Your indication he's stabbing him.
"A: Yeah.
"Q: How was Mr. McGraw laying?
"A: Face down.
"Q: Where at in the trailer?
"A: Right there in the living room.
"Q: Can you tell me what part of the living room?
 "A: He was facing the door right as he drug him in.
 "Q: Okay, so he was laying face down in the living room his head facing the door, close to the door then and was Gary standing up or kneeling down or what?
"A: Sitting over the back of him.
"Q: He was straddling him?
"A: Yes, sir.
 "Q: Okay, where was he striking him at with the knife?
"A: In the back.
"Q: Do you recall how many times he struck him?
 "A: God no, I didn't want to watch all that crap. I was trying to get [the] hell out of there then. I didn't know he was gonna do anything crazy like that. Hell no, I didn't . . . when that started happening I wanted out of there completely.
 "Q: All right, so Gary got straddle his back and was striking him in the back with the knife. Did you notice any other cutting going on?
 "A: There was so much blood and stuff all over him and all over Gary too that . . . it just . . . I'm telling you, if you've ever seen anything . . . I've never seen nothing like that before and it just . . . it makes you go . . . I just . . . even to this two months later here, I still have nightmares about it and stuff but as far as where all the hands and stuff were going . . . I don't. . . .
"Q: Did you see him cut his throat?
 "A: No, I don't remember seeing him cut his throat. I remember the stabbing and just slinging and I don't. . . .
 "Q: You see him slinging the knife or what . . . hacking at him or what . . .?
 "A: I remember his arms (inaudible) some but I remember him stabbing too and. . . .
 "Q: The main thing you remember is him sitting on his back stabbing.
"A: Yeah, God.
 "Q: All right, did anyone else have a knife in there?
"A: No, not that I know of.
 "Q: Was there any other knives involved in the murder?
 "A: Not that I know of. I didn't see any other knives.
 "Q: Okay, was there any other thing used, was Mr. McGraw hit with anything that you know of?
"A: Not that I know of.
 "Q: What about a cast iron skillet? Do you recall a cast iron skillet being used?
"A: Uhn-uhn (no).
"Q: Maybe a kitchen knife too.
"A: Uhn-uhn (no).
 "Q: The only thing you remember is Gary sitting on his back stabbing him with the pocket knife he had got from you from fishing that day?
"A: Yeah."
At page 9, defendant states:
 "Q: All right, when Mr. McGraw was down on the ground outside, did you see anybody cut him out there?
"A: Uhn-uhn.
"Q: Did you see any blows passed?
 "A: Blows passed. No, not . . . . you know, they wrestled around a minute when I was trying to get that thing in the car.
 "Q: Okay, did you and James help Gary get Mr. McGraw back inside, drag him back inside?
 "A: Yes, Gary asked us to help pull him back inside the door, which we did and James and I was carrying stuff out to the car. *Page 130 
 "Q: Okay, was Mr. McGraw conscious or unconscious at that time when y'all drug him back in that trailer?
"A: He was conscious.
"Q: Was he saying anything?
 "A: Uh, no he was . . . yeah, he was . . . God I don't remember. I honestly don't remember if he was saying anything but I know he was conscious cause he was uh tussling around.
"Q: Okay, you don't recall what he was saying?
"A: No, golly no.
"Q: How long. . . .
 "A: I told them, that's when we need to get [the] hell out of there."
Defendant goes on to state that he and his companions, Brown, Bynum and Davenport stashed some of their loot at a friend's house and then went to defendant's home where they burned their bloody clothing and boiled the defendant's knife (the murder weapon). Defendant further stated that he sold some of the stolen items and decided to flee the Jefferson County area — that he went to Mobile, traveled to Gulfport, Mississippi; Pensacola, Florida; and Panama City, Florida, before being captured at the bus station in Mobile.
Davenport: Jimmy Davenport, the driver, testified that he drove the defendant and two other companions, Brown (convicted and sentenced to death for his role in these events) and Bynum (convicted of felony murder arising out of these facts and sentenced to life) over to the victim's mobile home; that en route there were discussions about "killing a queer," that defendant Bankhead inquired of Bynum if he could hit hard, that he wanted Bynum to take the old guy out with one punch and that if he couldn't then he (Bankhead) could. Davenport testified that after arriving at the trailer he stayed in the car but could see what happened outside the trailer — that he saw Bankhead grab the old man and throw him to the ground and that Brown and Bynum began to punch the man. That then Bankhead, Bynum and Brown picked up the prostrate body of the victim and carried him into the trailer. That he next observed defendant, Bankhead, coming out of the trailer with some object that he put in the car, that Bankhead had blood all over his arms, hands and face, that Bankhead stated "shut up or you'll get the same as the old man"; Davenport describes the defendant's companions as carrying items out of the trailer and also as being smeared with blood. That ultimately when the car was so loaded with the victim's property that Brown had to ride in the trunk, that they proceeded to defendant Bankhead's home where the goods were divided, clothes burned and the murder weapon boiled in water.
Davenport leaves with Bynum by car and only talks with Bankhead one time subsequent to the murder relative to Brown being picked up by the police.
Blanche Bankhead: Divorced from defendant Bankhead subsequent to the murder, testified that she was putting her children to bed when she saw the blood smeared defendants enter her home, defendant Bankhead carrying a t.v. in his arms, that the defendant says " 'get out of here, don't ask me nothing, just get out of the room' " that she retired to her bedroom but sees the men bring in stereo equipment, a VCR, a microwave, etc.
Mrs. Bankhead described her husband talking to Brown and asking "are you sure he's dead, we've got to make sure he was dead." That Bynum stated "when Archie (Bankhead) handed me that knife, he told me to cut — you have to cut his throat." Further, that defendant, Bankhead, stated to Bynum "you weren't doing it right — I had to take the knife and slice his jugular vein."
The witness described how the defendants divided the money and appliances and how they ultimately separated.
Mrs. Bankhead described how her husband left town a few days later, described making a statement to law enforcement officers re what she had witnessed and heard the night of the murder. Mrs. Bankhead did not see her husband again until he appeared in court. *Page 131 
DEFENDANT'S CASE: Deputy Hatter testified that previous to the night of the murder the deceased had requested a neighbor to call the Sheriff's office for help, the deceased complained that someone had tried to kill him. Upon arriving at the McGraw residence, Deputy Hatter and her partner were advised by Mr. McGraw that everything was under control, that the offending party had left.
Additional evidence re previous burglaries at the McGraw residence were admitted into evidence by way of stipulation.
Robert Honeycutt testified that he had previously observed co-defendant Gary Brown at the McGraw trailer; that Brown appeared to be living at McGraw's trailer at one time.
Mrs. Yarbrough testified that she introduced Brown to Bankhead in connection with some roofing work.
Defendant Bankhead testified generally about his background, the events of the day leading up to the fateful ride to Mr. McGraw's trailer. Defendant states that he did not stab or hit the deceased and denies that he was blood-spattered and denies burning his clothes.
Defendant admitted fleeing from the Birmingham area and described the different geographical areas where he lived until being captured at the bus station in Mobile.
On cross-examination, defendant Bankhead states that he had previously been an instructor in four different karate schools, that he had traveled extensively, that on the night of the murder he and his companions were drunk and generally denied again being directly involved in the killing of the deceased.
Upon conviction for the capital offense, the case proceeded to the punishment phase before the jury wherein Dr. Robert Brissie was recalled for testimony relative to the wounds received by the deceased. No other testimony was adduced before the "punishment phase" jury.
At the final sentencing phase, a GED teacher in the county jail testified, stating that the defendant scored well on the GED exam, that defendant was cooperative and helpful in the work with other inmates.
Mrs. Yarbrough testified that the defendant was a good father, that he kept his children in church and that at one time the defendant was a good member of society.
Defendant Bankhead stated at the final sentencing that he was unhappy with his lawyers in that he felt that they had not spent enough time with him or handled his trial appropriately.
In conclusion, at the punishment phase of the trial before the jury and at the final sentencing hearing, the State was allowed to show aggravating circumstances and the defendant to show mitigating circumstances.
Relative to aggravating circumstances the court finds that the State has proven beyond a reasonable doubt:
§ 13A-5-49(A)
The capital offense was committed while the defendant was engaged . . . in the commission of a robbery.
The court finds this aggravating circumstance to exist.
§ 13A-5-49(8)
The capital offense was especially heinous, atrocious or cruel compared to other capital offenses.
In addition to the factual findings above, the undersigned notes that the deceased was 59 years of age at his death, lived alone, was unarmed and unsuspecting of his assailants' foul purposes.
Dr. Robert Brissie, coroner/medical examiner, testified that the deceased received 16 incised wounds to the neck, 59 stab wounds in the back deep enough to allow probing, the deepest of which approximated 2.0 inches, three stab wounds to the face and an incised wound to the scalp . . . as well as extensive areas of abrasion and contusion consistent with the attack outside the mobile home.
The most extensive injuries observed by Dr. Brissie were to the neck, the carotid artery and jugular vein being severed. Dr. Brissie opined that the deceased was, in all probability, alive throughout the course of *Page 132 
the homicidal acts — "all wounds depicted were ante mortem or prior to decedent's death."
The undersigned concludes that, based on evidence and the applicable case law, this capital offense is in fact especially heinous, atrocious and cruel compared to other capital cases.
The court finds no other aggravating circumstances to exist.
Mitigating Circumstances
At the punishment phase before the jury, the jury was afforded the opportunity to independently assess the existence of each statutory mitigating circumstance referenced at §13A-5-51(2) through (7), plus the opportunity to find mitigation by way of § 13A-5-52.
At the final sentencing hearing before the undersigned, a presentence report was submitted by probation services and admitted into evidence.
The court makes the following findings relative to mitigation:
§ 13A-5-51. Mitigating circumstances — Generally.
(1) The defendant has no significant history of prior criminal activity;
Does not apply. Defendant admitted on the stand to six (6) prior felony convictions, the probation report in "record of arrests" also depicts numerous other incidents of illegal conduct.
(2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;
Does not apply. There is absolutely no evidence supportive of this circumstance. Defendant has never been treated for mental or emotional disturbances.
The court is not unmindful that at final sentencing defendant stated that he was under emotional duress at the time of the murder — out of work, alcoholic wife in trouble with the law, four kids at home, no electricity.
(3) The victim was a participant in the defendant's conduct or consented to it;
Does not apply.
(4) The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor;
Does not apply. Defendant Bankhead was the oldest of the three defendants, Bankhead's home was utilized after the murder for the division of spoils, burning of clothes and general "covering of tracks"; according to state witnesses Davenport and Blanche Bankhead, defendant Bankhead played a major role in the killing and the events subsequent to the killing, culminating in Bankhead's "flight."
(5) The defendant acted under duress or under the substantial domination of another person;
Does not apply. No persuasive evidence whatsoever was adduced to suggest that this circumstance exists.
(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;
Does not apply. The undisputed evidence adduced at trial was that Bankhead had ingested beer and alcohol over the course of the day preceding this killing, yet the court does not deem that said ingestion diminished the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
(7) The age of the defendant at the time of the crime;
Does not apply. Defendant was 35 at the time of the offense, date of birth, September 6, 1950.
§ 13A-5-52. Same — Inclusion of defendant's character, record, etc.
Does not apply.
In conclusion, I hold that the aggravating circumstances discussed earlier, weighed against the absence of mitigating circumstances, compel the court to uphold the jury's advisory verdict affixing punishment at death.
DONE AND ORDERED this 19th day of November, 1987. *Page 133 
/s/ James H. Hard
James H. Hard, Circuit Judge
[1] Gary Leon Brown was convicted of capital murder and was sentenced to death. This Court upheld the conviction. Brown v.State, 545 So.2d 106 (Ala.Cr.App. 1988), aff'd, Ex parte Brown,545 So.2d 122 (Ala. 1988), cert. denied, 493 U.S. 100,110 S.Ct 257, 107 L.E.2d 206 (1989). James Lynn Bynum was convicted of the lesser offense of murder and was sentenced to life imprisonment. Bynum v. State, 527 So.2d 177 (Ala.Cr.App. 1988).